OF THE STATE OF ARKANSAS. 495

TERM, 1857.]          Harriet and others vs. Swan & Dixon.

HARRIET AND OTHERS VS. SWAN & DIXON.

Where the law prescribes a certain form and manner for manumission, no other man-
ner or mode can be adopted or pursued by which it can be lawfully effected; and so
a deed of emancipation in this State is inoperative unless it be proved or acknow-
ledged in Court as prescribed by the statute.

The possession by an administrator of the estate of the intestate, continued for a long
time after the period limited by law for closing the estate and distributing the pro-
perty, does not, by the mere lapse of time, change the original character of the
possession, and make it adverse against those entitled to distribution, or create any
right or title in the administrator under the statute of limitations.

Appeal from the Chancery Court for Pulaski county.

The Hon. HULBERT F. FAIRCHILD, Chancellor.

FOWLER for the appellants.

WATKINS & GALLAGHER for the appellees.

Slavery is recognized by our constitution, and it is the funda-
mental law of the land, and the constitution has directly pro-
hibited the Legislature from emancipating slaves without con-
sent of the owner. *Tit. Eman.*, sec. 1, p. 55, *Dig. Rev. Stat.*
Slavery was recognized in the Territory of Arkansas, under
and by virtue of the constitution of the United States; and by
express treaty with France on the purchase of the Louisiana
Territory; and statutory laws were enacted allowing slaves to
be emancipated, and prescribing the manner and mode in which
it should be done to make it legal. Thus whilst negro slavery
was recognized by the laws of Arkansas, under and by virtue
of the constitution of the United States, and by treaty as a part
of the fundamental law of the land—emancipation on the other
hand was but the creature of the statute, and from the statute

the right of manumission drew its very life and existence. Thus by the letter of the statute must it be governed.

In the case of *Givens & Reynolds vs. Mann*, 6 *Munford Rep.* 201, upon a trial for emancipation, the plaintiffs offered in evidence a deed of manumission recorded in the district Court, where by the laws of Virginia, a deed of manumission must be proved in the County or Corporation Court. The deed was rejected by the Court; which decision was affirmed by the Court of Appeals.

And we lay it down broadly that where the law prescribes a certain form and manner for manumission, no other manner or mode can be adopted by which manumission can be carried out; and that the requisites of the statute must be strictly complied with, and the power to manumit can only be exercised in the mode directed by the statute, so held by our Supreme Court, in the case of *Campbell et al. vs. Campbell et al.*, 13 *Ark. Rep.* 519. See, also, *McCutchen vs. Marshal et al.*, 8 *Peters* 238. *Winney vs. Cartwright*, 3 *Marsh.* 403. *Bazzie vs. Rose and her child*, 3 *Martin L. Rep.* 149. 7 *La. Rep.* 135. 14 *J. R.* 324. 19 *J. R.* 53. *Cooke vs. Cooke*, 3 *Litt.* 326. *Beall vs. Joseph, Hardin Rep.* 51, 5 *Martin's Rep.* 494. 4 *Martin La. R.* 212. *Negro James vs. Gaither*, 2 *Har. & John.* 176. 6 *Munford* 191. 1 *Rand.* 15. *Bibb's R.* 57.

The authority given to emancipate by a prescribed method was a prohibition to emancipate in any other way. *Dunlap vs. Archer*, 7 *Dana* 32. *Trotter vs. Blake*, 6 *Port.* 292, 295. *Alwood vs. Beck*, 21 *Ala.* 612.

See *Scott, (man of color,) vs. Emerson*, 15 *Missouri Rep.* 587, where the subject of slavery is fully discussed, and the previous decisions in that State reviewed, and the above authorities fully sustained; which case is cited and approved by the Supreme Court of Mississippi in the case of *Sylvia vs. Kirby*, 17 *Miss.* 434.

Gilbert Barden died in June, 1838—the pretended deed of manumission was not filed for record until 1839; showing that the same must have been retained by him until his death, and never delivered by him. This would invalidate it. See the

cases above cited, 14 *John. Rep.* 324. 19 *Johnson R.* 53. *Campbell vs. Campbell et al.*, 13 *Ark.* 520.

Charlotte Barden, we maintain, had no right to dispose of the slaves, belonging to the estate of Gilbert Barden, deceased, either by freeing them, or otherwise. Neither did her possession of them, for any length of time, vest in her any such right, by lapse of time, or by the statutes of limitations; whether we consider, that she held the same, as tenant in common, with the heirs at law, or as administratrix. We again repeat, that we here allude to the interest in them, other than her dower interest, because as to that interest, there is not a shadow of right in appellants, to their freedom, by virtue of any statute of limitations.

And we call the attention of the Court to the following authorities.

Charlotte Barden, as administratrix of Gilbert Barden's estate, made her last settlement in May, 1844, with the Probate Court of Pulaski county, showing in her hands, a balance belonging to the estate, of $3,901 97; this included the value of the negro slaves, named in the inventory. Without a surrender of these effects to the lawful distributees, or to the court, and a discharge by the Court, she could not be released from the duties and liabilities imposed upon her, by her administration. She was never discharged or released from the same. "If a trustee is in possession, and does not execute his trust, the possession of the *trustee*, is the possession of the *cestui que trust;* and if the only circumstance is, that he does not perform his trust, his possession operates nothing as a bar; because his possession is according to his estate." *Pr. Ld. Redesdale, in* 2 *Sch. & Lef.*, 606; cited in *Angell on Lim.*, sec. 166; and in the same section, the latter says: "To exempt a trust from the bar of the statute of limitations: It must first be a direct trust. 2d. It must be of a kind, belonging exclusively to the jurisdiction of a Court of Equity, and then the question must arise between the *trustee*, and the *cestui que trust. See, also, the* 168th *section, of same work. Norths admr. vs. Barnum,* 10 *Vermont R.* 223. 11 *Dana* 211. *Coon vs. Nicholas,* 2 *W. & S,* 28. *Kane*

*vs. Bloodgood,* 7 *Johnsons Ch.* 121, 133, 136. *Redwood vs. Reddock,* 4 *Mun.* 227. *Meddicott vs. O'Donnell,* 1 *Ball & B.* 166, 169. *Wamer vs. Barnett,* 4 *Wash. C. C.* 640. *Adams as admr. vs. Taylor,* 14 *Ark. Rep.* 66. 4 *Eng. Rep.* 518. *Decouche vs. Savatier et al.,* 3d *Johnson's Ch. Rep.* 216. *Beckford vs. Wade,* 17 *Vescy* 97. *Lexington and Ohio R. R. Co. vs. Bridges,* 7 *B. Monroe* 556. *McDonald vs. Simms,* 3 *Kelly* 383. *White vs. White, Maryland Ch. Decisions,* 53.

Even if there was a breach of trust on the part of Charlotte Barden, it would not avail the appellants any thing.

" *Acquiescence* in a breach of trust, will not prejudice a person, who was ignorant of his rights. *Walker vs. Symond,* 3 *Swanst.* 64. *Cholmondoley vs. Clinton,* 2 *Miss.* 362. *Blanherhasset vs. Day,* 2 *Ball & B.* 137.

And equity has frequently relieved, after long lapse of time, when *cestui que trust,* has *not due* information of the circumstances. *Ryder vs. Beekerton,* 3 *Sw.* 80 *and n. Underwood vs. Stevens,* 1 *Mer.* 713. *Adams vs. Clifton,* 1 *Russ.* 207. *Barnes vs. London Watercourse Company,* 3 *Madden* 375. *Randal vs. Erington,* 10 *Ves.* 423. *Wedderben vs. Wedderben,* 1 *Keen.* 749. 4 *M. & Cr.* 52.

It lies upon the trustee, who rests his defence on the *acquiescence* of *cestui que trust,* in a breach of trust, to prove they had knowledge, or notice of the fact. *Hill on Trustees, page* 627. *Randall vs. Errington,* 10 *Ves.* 428. *Lincoln vs. Wright,* 4 *Bea vers* 429. *Downes vs. Grayebrook,* 3 *Mer.* 208.

When the possession of a party, holding slaves, is at the commencement, permissive, his declarations, that he holds them as his own, if not brought home to the knowledge of the owner, do not constitute adverse possession, so as to bar the right of the owner, under the statute. *Spalding vs. Grigg,* 4 *Ga. R.* 75. *Walker vs. Symonds,* 3 *Sw.* 64. *Breckenridge vs. Glasse, Cr. & Ph.* 135–'6. *Harris vs. King,* 16 *Ark. Rep. p.* 122, *and authorities there cited.*

These authorities clearly show, that the statute of limitations cannot avail the appellants in this suit.

Mr. Justice Scott delivered the opinion of the Court.

This is an appeal on the part of certain slaves, claiming the right to freedom, who were allowed to interplead by guardian in a proceeding in the Chancery Court of Pulaski county, wherein the appellees sought, as heirs and distributees of Gilbert Barden, deceased, to recover from the executor of Charlotte Barden, deceased, and others, the entire estate of the former, in which was included the appellants. Upon the hearing, the Chancellor found the issues, upon the question of freedom, against the appellants, and rendered a final decree accordingly, that being a portion of his final decree upon the whole case, which was rendered in favor of the complainants below, the appellees here.

The appellants' claim to freedom is based upon the following copied instruments, to wit:

" Be it remembered, that I, Gilbert Barden, of the county of Pulaski, in the State of Arkansas, having the intention that my slaves, to wit: one man named Isaac, of a black complexion, about forty-six years old, and Harriet, a woman of black complexion, about twenty years old, and her two children, a girl named Mary Ann, of yellow complexion, about five years old, and David, a boy of yellow complexion, about six months old, should be free at the death of my wife, Charlotte Barden, and manumitted from a state of slavery, but that they should remain her slaves during her life. Now, be it known, that I, Gilbert Barden, for divers good reasons and considerations me thereunto moving, have and do hereby give unto the above named negro slaves, each and respectively, after the death of my said wife, Charlotte Barden, (if they so long live,) their entire freedom, provided they continue faithfully and obediently to serve my said wife, Charlotte Barden, as dutiful slaves to her during her life; and after her death upon condition of their being her faithful servants, I then manumit and discharge them from slavery, and give unto them and each of them, after that event, their entire freedom, if they so long live.

Given under my hand and seal, this 16th day of June, in the year of our Lord, 1838.

his

GILBERT ⋈ BARDEN.

mark.

Signed, sealed and delivered in presence of us,

    JOHN TAYLOR,

her

CHARLOTTE ⋈ BARDEN.

mark.

Witness to Charlotte Barden's signature,

JOHN H. REED.

STATE OF ARKANSAS,⎱
    COUNTY OF PULASKI. ⎰

I, Lemuel R. Lincoln, Clerk of the Circuit Court and ex-officio recorder of the county aforesaid do hereby certify that the annexed and foregoing instrument of writing was filed for record in my office on the 7th day of January, A. D. 1839, and the same is now duly recorded in book X, pages 239, etc.

In testimony whereof, I have hereunto set my hand and affixed the seal of my office, at Little Rock, the 21st day of [L. S.] January, in the year of our Lord, one thousand eight hundred and thirty-nine, and of the independence of the United States the sixty-third year.

LEMUEL R. LINCOLN, *Clerk*

*and Ex officio Recorder.*

" Be it remembered that whereas, I, Gilbert Barden, of the county of Pulaski, and State of Arkansas, have this day executed my deed for the manumission of my negro woman slave, named Harriet, and her two children, Mary Ann and David, after the death of my wife, Charlotte Barden, upon condition of their remaining during her life her faithful slaves and servants: Now, I, Gilbert Barden, hereby declare that I have given and hereby do give to the said Harriet, when she shall obtain her freedom under said deed, upon the condition aforesaid, the following parcel of land, consisting of about twenty-nine acres, that is, the north portion of the fractional section thirty-five, on

which I now live, in township one north, in range twelve west, dividing said fractional section by an east and west line, so as to cut off forty acres on the south side thereof, situate, lying and being in the said county of Pulaski in said State.   To have and to hold the said northern portion of said fractional section of land, containing about twenty-nine acres, more or less, to her the said Harriet, after the event, and on the condition afore-said, to her and her heirs forever.   And I, the said Gilbert Bar-den, hereby, for myself, my heirs, executors, etc., to the said Harriet, etc., the said land above granted shall and will forever warrant and defend.

Given under my hand and seal, this 16th day of June, in the year 1838.

his

GILBERT ⋈ BARDEN.

mark.

Signed, sealed and delivered in presence of us,

 JOHN TAYLOR,

her

 CHARLOTTE ⋈ BARDEN.

mark.

Witness to Charlotte Barden's signature,

JOHN H. REED."

This instrument was also officially certified in the same terms as that first above copied, and both of them were proven, by the deposition of Albert Pike, to be in the handwriting of John Taylor, who practiced law in Arkansas, and resided in Little Rock in the year 1838, and in that or the next year went to Texas, where he was at the time of making the deposition, if not dead.   That, when here, he was Barden's attorney.   That Reed was dead, and that his signature was genuine.

Another instrument of writing, signed and sealed by Char-lotte Barden, and witnessed by J. H. Reed, Sidney Blackburn, and Asa G. Baker, was admitted in evidence by agreement. This bore date the 19th of June, 1839, and referring to the two foregoing instruments and the death of Gilbert Barden, declar-ed, as was recited, that for the purpose of giving his intention

effect with regard to the manumission of the slaves, that they had been obedient and dutiful servants, and that she desired that it should be taken that they had continued so up to the time of her death, unless she should, before that time, demand a return of the instrument of declaration from Asa G. Baker, into whose hands she executed it, with a view to place it, together with the original of the two instruments above copied, to be held by him subject to her order.

The appellants also rely upon the last will and testament of Charlotte Barden, deceased, which was made and published the 29th October, 1840, and which was regularly probated and recorded in the Probate Court of Pulaski county, in the year 1851, by which she bequeathed one-third of her estate, consisting of lands, goods, chattels and choses in action, to her niece, Rebecca Brookin, of Pike county, Georgia, and two-thirds to the Methodist Episcopal Church at Little Rock, for the benefit of that body and the spread of the Gospel. That the appellants, Isaac and Harriet, should be emancipated and set free immediately after her death, and that Mary Ann, David Scott, Martha Jane, Lucinda and Isaac Henry, children of Harriet, should be set free, as they should respectively arrive at the age of twenty-one years. That said children of Harriet and other children of hers, that might be thereafter born, and the children of the children, if any, should be hired out until they should arrive at the age of twenty-one years, respectively, and that, after paying the expense of raising said children, one-half of their hires should be given to the trustees of said church, and the other half to the children. Bertrand was appointed executor, and in August, 1851, took upon himself the burden thereof.

Upon the death of Gilbert Barden, his widow, Charlotte Barden, regularly took the administration of his estate, returned an inventory of it, including the slaves in question, and made some settlements from time to time with the Probate Court, but her administration was never closed up, and she was never discharged therefrom. Nor was her dower ever set apart to her, nor was there any distribution of the estate. But it remained in her hands intact, from the time she took out administration

until her death, and then it passed to the hands of the executor of her last will and testament. Neither she nor her husband ever had any children, and the slaves of the estate did not come to Barden by her. Nor does it appear that she had any interest or estate other than such as she was entitled to in her husband's estate on account of her dower rights.

The questions then, so far as these appellants are concerned, are:

1st. Were they entitled to their freedom under the deeds executed by Gilbert Barden?

2d. Were they entitled to it under Mrs. Barden's will?

The first question is distinctly settled, against the appellants, in the case of *Isaac N. Jackson vs. Bob*, decided at the present term. When these deeds were executed, as now, there were but two ways by which a person owning slaves, could manumit them: 1st, by last will and testament: 2d, by some other instrument of writing under the grantor's hand and seal, attested and proved in the District (Circuit) Court by two witnesses, or acknowledged by the party in the Court of the district (county) where the grantor resided. *Sec.* 20, *p.* 526, *Steel & McC. Dig.*

These deeds were never so proven or acknowledged.

In the case of *Givens & Reynolds vs. Mann*, 6 *Munf. R.* 201, upon a trial for emancipation, the plaintiffs offered in evidence a deed of manumission recorded in the District Court, when by the laws of Virginia, such a deed must be proven in the county or corporation court. The deed was rejected and the Court of Appeals affirmed the decision.

Besides the case of Bob, and the previous case of *Campbell et al. vs. Campbell et al.*, (13 *Ark.* 509,) decided in this Court, there are a large number of cases cited in the brief of the counsel for the appellees, which sustain the doctrine unequivocally, broadly and distinctly, that where the law prescribes a certain form and manner for manumission, no other manner or mode can be adopted or pursued by which it can be lawfully effected.

Under this state of the law, as applicable to the case before us, it becomes unnecessary for us to look to the provision of the

deeds in question, and determine whether they, or either of them would be sufficient, if they had been properly proven or acknowledged; and therefore we are not to be understood as passing upon their sufficiency in that view.

To sustain the appellants' claim under the will of Mrs. Barden, the statute of limitation and lapse of time are insisted upon as giving her title to them. But the difficulty in the way of that theory is the want of the indispensable pre-requisite—adverse possession on her part. Unquestionably they went into her hands as administratrix, and she so treated them upon the records of the Probate Court. She died in July, 1851, and this bill was filed in June, 1852, a few days less than one year after her death. That she was entitled to the possession of the slaves as administratrix, is clear enough from several provisions of the law then in force. Under the provisions of sec. 21, (*of Steel & McCampbell's Dig. p.* 55) of the administration law then in force, executors or administrators were empowered to sell all personal estate and slaves, for the payment of debts and legacies, when necessary, selling *slaves* last. Under *sec.* 24, *p.* 56, *ib.*, they were empowered under direction of the Court, to hire out *slaves*. Under *section* 47, *page* 69 *ib.*, where no known heirs, or where legal heirs or legal representatives did not appear within two years after publication of notice, they were to sell all personal property and *slaves*, whether necessary for payment of debts or not. And the administration law that was put in force in the State, 20th March, 1839, was to the same effect as to administration on slaves as part of the personal estate of the deceased. And in *Menifee's ad. vs. Menifee et al.*, 3 *Eng. R.* 46, *et seq.*, this Court decided that although slaves and real estate descended to the heirs at law, yet the administrator or administratrix was clearly entitled to the possession of the same for the purposes of administration; overruling on this point the previous cases of *Hill's ad. vs. Mitchell*, 5 *Ark.* 609, and *Morrill et al. vs. Menifee's ad.*, *ib.* 629, and that that was the true construction of the law previous to the passage of the act of 1846, expressly making slaves and lands assets in the hands of the administrator or administratrix.

OF THE STATE OF ARKANSAS. 505

TERM, 1857.]          Harriet and others vs. Swan & Dixon.

In May, A. D. 1844, Mrs. Barden mader her last settlement with the Probate Court, showing in her hands a balance belonging to the estate, which balance was struck from an aggregate, which included the appraised value of the appellants. She never, afterwards, surrendered these effects to distributees, or divided them between herself as dowress and such distributees, or made any effort to do so, so far as any thing appears on this record; on the contrary, she never closed the administration in any way, or sought any discharge from it, as is expressly admitted; and from every thing that appears on the record, from the time of that settlement (her will having been made some four years previously) until the day of her death, the affairs of the estate, and the possession of the slaves, seem to have been, in all respects material to the question we are considering, in the same condition that it had been from the death of her husband, up to the time of that settlement.

Under such circumstances, to allow lapse of time to create in her right and title to the property, would be, in the language of the Chancellor, "to encourage neglect and violation of law in the settlement of estates, and to reward breaches of trust in the disposition of the property of estates.

In any view, under the circumstances of this case, whether she is to be made accountable as administratrix or as tenant in common, she was a trustee to preserve the estate for those beneficially interested. So that it is not necessary to decide in which of these two attitudes to place her, although from analogous doctrines, which seem to be established by highly respectable authority, it would seem that the appellees would have the right to hold her to account as administratrix, and under some circumstances this might be an important right, since there would be bond and security for the representative trust, and none for the trust as co-tenant in common. Thus, the cases of *Wallace vs. Taliaferro*, 2 *Call R.* 447—*Ib.* 471, and the cases 12 *Vesey* 497; 16 *Vesey* 413; 5 *John. R.* 211, seem to establish the doctrine that where the husband is in possession of property in the *character* of *executor*, or in *right* of his *wife* as

33

*executrix*, this possession alone is not sufficient to alter the property and vest the estate in the chattels in himself *as husband* so absolutely that on his death they shall not survive to the wife, but shall pass to his representatives. And, also, that if another person was executor, and the husband got possession of the property, that possession would not avail him unless it was with the executor's assent. And the case in 6 *Munf. R.* 70, decides that, where both characters are united, the law is the *same*, and that an *election* to take as devisee must be expressed or implied from sufficient circumstances, otherwise he would be considered and held as in possession *as executor*—possession as husband seeming to be considered as indispensably necessary to be shown. And this seems to have been carried to a great extent in the case of *Gregory's admr. vs. Mark's admr.*, 1 *Rand. R.* 355, where the husband, in right of his wife, had no right to *specific slaves*, but only to an *undivided portion* of certain slaves, and there had been a decree for a division, which one might suppose would have altered the property as much as the administrator's assent, and in pursuance of which decree there was a division made by commissioners, and the husband took possession of his wife's part as allotted, yet it was held that that possession did not come up to the standard of possession *as husband*, because the report of the commissioners had not been returned and acted upon by the Court. This, doubtless, was going a long way, and ought not to be held as law, but it serves to illustrate, in a striking manner, the fallacy of a claim to change the character of a possession once fixed—as was that of Mrs. Barden's in this case—as administratrix, to that of mere dowress and joint co-tenant with the proper distributees of her intestate's estate; much less to that of an adverse possession from the mere sliding away of time, during which no one may have interfered with her, either to stimulate her to the proper execution of her trust, or to the assertion of her claim to her dower rights in severalty.

But, as we have said, that point need not be decided, because, in either event, she is accountable as trustee. And the rule is, that " if a trustee is in possession, and does not execute his

trust, the possession of the trustee is the possession of the *cestui que trust;* and if the only circumstance is, that he does not perform his trust, his possession operates nothing as a bar because his possession is according to his estate;" Per Ld. Redesdale in 2. *Sch. & Lef.* 606, cited in *Angell on Lim. sec.* 166; and in the same section the latter says: " To exempt a trust from the bar of the statute of limitations, it must first be a direct trust; second, it must be of a kind belonging exclusively to the jurisdiction of a Court of Equity, and then the question must arise between *trustee* and *cestui que trust.*" And in section 168 of Mr. Angell's work, it is said: " The most common mode of creating direct trusts not cognizable at law, is by the appointment and qualification of executors and administrators, who are precluded from taking beneficially; and administrators, claiming merely as such, cannot, by virtue of lapse of time merely, set up title to the general residue. But being simply and technically trustees, there is no principle of equity which, upon that single consideration, can admit of their holding to the exclusion of the parties beneficially interested." (See also the cases cited on this point in the appellees' brief, among which are several cases decided in this Court.)

And if it had been shown that Mrs. Barden had committed a breach of her trust beyond the mere *non-execution* of it, it could not avail the appellants, because mere acquiescence in a breach of trust will not prejudice a person who was ignorant of his rights; and it lies upon the trustee, who rests his defence on the acquiescence of *cestuis que trust* in the breach of trust, to prove they had knowledge or notice of it. (*Hill on Trustees, p.* 627, and *other authorities cited by appellees.*

We think there can be no doubt but that the law is against the appellants upon the second and last ground, upon which they claim their freedom, as clearly as upon the first.

We shall, therefore, affirm so much of the Chancellor's decree, as was appealed from.

Absent, Hon. Thomas B. Hanly.