### KANSAS CITY SOUTHERN RY. CO. v. STEVENSON.

(Circuit Court, W. D. Arkansas, Ft. Smith Division. March 4, 1905.)

EQUITY—LACHES—SUIT TO ENFORCE TRUST.

Where defendant, on resigning the presidency of a railroad company, retained the title to certain property in another state, which had been donated to induce or aid in an extension of the road, claiming that the property was his own and did not pass to the company, which claim was shortly thereafter known to the officers of the company, a delay of over nine years before bringing suit to establish and enforce the trust, in the absence of any showing in excuse, was such laches as to bar the right to relief, where actions at law to recover the property would have been barred, under the laws of the state, in from three to seven years.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Equity, §§ 191–196; vol. 47, Cent. Dig. Trusts, §§ 568–573.]

In Equity.

Read & McDonough, for complainant.
H. C. Mechem, for defendant.

ROGERS, District Judge. I must regard the proof in this case as establishing the fact that the donations and subsidies in controversy, received by L. L. Bush in his own name while the president of the Kansas City, Ft. Smith & Southern Railway Company of Missouri, and the donations and subsidies in controversy received by John B. Stevenson, Jr., in his own name while president of the same corporation, were held in trust by each of them for the corporation, and that the said donations so received by the said Bush, and subsequently conveyed by him to said Stevenson, were held by said Stevenson in trust, also, as the property of said corporation, because it is clear that Stevenson, before he took the title, had ample

notice of the conditions under which Bush had received the donations and subsidies to put him upon inquiry, which, if followed up, would have disclosed all the facts. Percy v. Cockrill, 53 Fed. 875, 4 C. C. A. 73. Stevenson was a trustee for the company, its president, and he could not be allowed to buy for himself property held in trust by Bush for the company. Nor could he be allowed to buy properties for himself while president which were essential to the operation of the company's road—for instance, the right of way on which it had been built, or property necessary for its business. His duty was to procure such properties for the company, and he could not, for personal gain, be allowed to disregard his duty and violate his trust by antagonizing the very interests it was his duty to subserve and promote.

The properties in controversy all lie in Arkansas. The contention is that the corporation could not accept subsidies and donations in Arkansas to aid in building or extending its line of road into the state of Arkansas, (1) because its charter gave it no right to build elsewhere than in Missouri; (2) because to extend its line in Arkansas without compliance with the laws of Arkansas was against the public policy of that state. I have examined with great patience the statutes of Missouri under which the corporation was organized, and I have reviewed the history of all railroad legislation in Arkansas, and examined all statutes which relate to its public policy as regards the construction by foreign corporations of their roads into the state of Arkansas. I have also examined the authorities, and considered carefully the argument of the learned counsel who seeks to uphold the contentions stated. It has proven a very interesting and important inquiry, in a general way; but I do not deem the contentions essential to the correct determination of this case. As throwing light on this subject, I cite 1 Rev. St. Mo. 1889, §§ 2508, 2543, 2568, and the acts of Arkansas of March 22, 1887, March 16, 1881, and March 13, 1880, all of which, except the first act, are found in Kirby's Digest, under the head "Railroads"; and also the following decisions: Bank of Augusta v. Earl, 13 Pet. 587, 10 L. Ed. 274; Thompson v. Waters, 12 Am. Rep. 243; Fidelity Mutual Life Ass'n v. Ficklin (Md.) 21 Atl. 680; Levi v. Thompson et al., 4 How. 17, 11 L. Ed. 856; Executors of McDonogh et al. v. Murdoch et al., 15 How. 413, 14 L. Ed. 732; Paul v. Virginia, 8 Wall. 177, 19 L. Ed. 357; St. Louis v. Ferry Co., 11 Wall. 429, 20 L. Ed. 192; Railroad Co. v. Harris, 12 Wall. 81, 20 L. Ed. 354. But as it is not necessary to decide the contentions suggested, I do not pass upon them, but, following the wholesome rule, will leave these matters to be determined when a case shall arise which makes it necessary to do so.

It was also contended that if the Missouri corporation, in point of fact, accepted the donations and subsidies in controversy in the name of its president, as trustee, nevertheless it could gain no footing in a court of equity to enforce the trust, because the trust itself was both ultra vires and in violation of the public policy of the state of Arkansas. That question is pretermitted, also, as not essential to the correct determination of this case.

It is contended that the bill cannot be maintained, because of laches in instituting the suit. The evidence of the case is voluminous, and a vast deal of it extraneous and irrelevant. I have gone over it all carefully and patiently, and regard it unprofitable to review it. I consider that it shows the following facts upon which the case must go off: The Kansas City, Ft. Smith & Southern Railway Company, a Missouri corporation, prior to 1890 was building a road in southwestern Missouri to the Arkansas state line, near Sulphur Springs, Benton county, Ark. L. L. Bush was its president. He was building the road under an arrangement by which he was to have so much stock and so many bonds of the company per mile as the road was completed and turned over to the company. Under this arrangement, the exact nature of which is not, in its details, made clear by the proof, Bush had become the owner of $825,000 of stock and $825,000 of bonds of the company for road constructed in Missouri. Bush and the company were both embarrassed for funds to continue the work. G. G. Latta, of Philadelphia, had become involved by indorsements for and advancements made to Bush, and held Bush's stocks and bonds as collateral to secure him therefor. To relieve the road of its embarrassments, some time prior to January 15, 1891, Latta became the owner of all Bush's stocks and bonds; and on the 15th day of January, 1892, Bush resigned as president of the company, and defendant, Stevenson, was elected president in his stead. Latta and his friends afterwards, on the 3d of January, 1893, sold all the stocks and bonds of the Kansas City, Ft. Smith & Southern Railway Company to the Missouri Coal & Construction Company, also a Missouri corporation, which afterwards changed its name to the Philadelphia Construction Company, also a Missouri corporation. Stevenson, however, under the arrangement made at the sale, remained nominally president of the Kansas City, Ft. Smith & Southern Railway Company, in order to secure certain deferred payments for the stocks and bonds. These deferred payments having been made, Stevenson's resignation as president was accepted on June 12, 1893, although the management of the corporation had passed completely into the control of the Missouri Coal & Construction Company on June 1, 1893, when its own board of directors were elected. When the properties in controversy are sifted, it is admitted that only four tracts of land and the Sulphur Springs town site stock are really in controversy. The other properties described in the bill have either been conveyed by Stevenson to the railroad company, or were acquired by him after he ceased to be president, or were disclaimed in his answer. The properties in controversy, therefore, are the town site stock, which was owned by Bush prior to April 15, 1892, on which day he assigned it to defendant, Stevenson; the quarry tract, which was conveyed to Bush December 28, 1888 (this land was conveyed by Bush to defendant, Stevenson, along with other properties, on April 15, 1892); the Y property, purchased by Stevenson from one Dunn and wife, conveyed to him March 11, 1893, and the deed recorded May 24, 1893; the Heckman tract, conveyed to Stevenson September 27, 1892, another deed correcting the first being made to him March 23, 1893, and recorded May 24, 1893; and the McGraw tract, conveyed to defendant, Stevenson, April 6, 1892, and the deed recorded May 24, 1893. It will therefore

be seen that all this property was acquired by Stevenson before his resignation was formally accepted as president of the Kansas City, Ft. Smith & Southern Railway Company, but the three last tracts were acquired after Latta and his friends had sold all the stocks and bonds of the Kansas City, Ft. Smith & Southern Railway Company to the Missouri Coal & Construction Company, to wit, January 23, 1893. Passing over defendant's evidence, the testimony of the plaintiff's own witnesses, Trimble, Martin, Gentry, and Hibler, proves, that within a few weeks, or, at most, months, after this sale, it was brought to the attention of the officers of the Missouri Coal & Construction Company that Stevenson claimed that the sale of the stocks and bonds of the Kansas City, Ft. Smith & Southern Railway Company to the Missouri Coal & Construction Company (both Missouri corporations) did not carry with it any of the properties in Arkansas, and that Stevenson not only claimed all donations and subsidies in Arkansas, but also the right of way of the railroad company from the Arkansas state line to Sulphur Springs, Ark., and certain railroad iron deposited on the right of way of the road in Arkansas, as his own property. The right of way and some other matters were subsequently adjusted after some litigation between the Philadelphia Construction Company and Stevenson and others, but no steps were taken to recover the properties now in controversy until October 2, 1901, eight years and nine months after the sale of the stock by Latta and others to the Missouri Coal & Construction Company, and more than eight years after Stevenson set up his claim to all the Arkansas properties in controversy. During all this time the proof fails to show that the company was in possession of any of the property in controversy, and by a deed made by Stevenson in 1895 that part of the Y property now in controversy was specifically reserved from the conveyance. There is no semblance of any allegation in the bill showing any reason why the plaintiff company and those under whom it holds have not taken steps at an earlier date to assert its claim to the property in controversy. The statute of limitations in Arkansas applicable to the recovery of town site stock is three years, and the statute applicable to the recovery of real estate is seven years. The rule in equity in such cases, assuming that Stevenson was a constructive trustee for the Kansas City, Ft. Smith & Southern Railway Company of Missouri, and that the properties in controversy passed to the Missouri Coal & Construction Company by assignment of the stocks and bonds by Latta and others to the latter company, is clearly stated in McCaughey et al. v. Brown et al., 46 Ark. 34:

"It was competent for equity to grant the full measure of this relief. It frowns upon a multiplicity of suits, and, when the appellees had successfully invoked its aid to invest them with the legal title, it would not then remit them to an action at law to recover possession; but, having taken jurisdiction of the case for its own exclusive purposes, it would retain the cause to administer the legal after the equitable relief. It is long established that 'courts of equity in cases of concurrent jurisdiction consider themselves bound by the statute of limitations which governs courts of law in like cases, and this rather in obedience to the statute than by analogy.' Farnam v. Brooks, 9 Pick. 212. The evil resulting from delay in the enforcement of legal and equitable rights is the same, and the courts of equity take the same limitations for their guide that govern law courts in analogous cases. This is illustrated in this court by the application of the statute governing actions

to recover real estate to a suit to foreclose a mortgage (Ringo v. Woodruff, 43 Ark. 469), as well as to remove a cloud from the title, as in Conway v. Kinsworthy, 21 Ark. 9. It is argued further that Mrs. McGaughey, and her heirs after her death, held the land in trust for the heirs of Fountain Brown, and that the statute will not bar a trust. Express and positive trusts are certainly within the rule contended for. But this doctrine is subject to two qualifications, namely, that no circumstances exist to raise a presumption of the extinguishment of the trust, and that no open denial or repudiation of the trust is brought home to the knowledge of the parties in interest, which requires them to act as upon an asserted adverse title. Angell on Lim.; Wood on Lim. 212, 213; Harriet v. Swan, 18 Ark. 495. The rule, with the exceptions, was clearly stated by Judge Fairchild in Brinkley v. Willis, 22 Ark. 6, and the benefit of the statute was denied an executor, ten years after his breach of duty, because the trust was still subsisting; the executor not having been discharged therefrom by the probate court. But this does not help the appellees'.case, for, if we should regard James A. McGaughey as in possession of the estate in his own right, still the facts remain that he was regularly discharged from the trust by the probate court in 1870, and the lands were held adversely for more than seven years thereafter. The following language used in Clarke v. Boorman's Executor, 18 Wall. 493, 21 L. Ed. 904, is applicable to this case: 'It may be conceded that, so long as a trustee continues to exercise his powers as trustee in regard to property, he can be called to account in regard to·that trust. * * * But when he has closed up his relation to the trust, and no longer claims or exercises any authority under the trust, the principles which lie at the foundation of all statutes of limitation assert themselves in his favor, and time begins to cover his past transactions with the mantle of repose.' But trusts which arise from the operation of law (that is, constructive trusts) are subject to the operation of the statute. The possession of Mrs. McGaughey and her heirs falls under this class, and it was incumbent upon the appellees to assert their rights within the period limited by the statute after knowing the facts in relation thereto. Ashhurst's Appeal, 60 Pa. 290, 316. They seek to evade the force of the statute by contending that the appellants' title originated in a fraud which no time will bar. To warrant this conclusion, not only must the trust be established, but the fraud must have been successfully concealed from the knowledge of the beneficiaries. Wood on Lim. § 275 et seq.; James v. James, 41 Ark. 301; Geisreiter v. Sevier, 33 Ark. 534; Meyer v. Quartermous, 28 Ark. 45. In Marsh .v. Whitmore, 21 Wall. 178, 22 L. Ed. 482, the court quote approvingly this language from Badger v. Badger, 2 Wall. 95, 17 L. Ed. 836: 'The party who appeals to the chancellor in support of a claim, where there has been laches in prosecuting it, or long acquiescence in the assertion of adverse rights, should set forth in his bill specifically what were the impediments to the earlier prosecution of his claim, how he came to be so long ignorant of .his rights, and the means used by the respondent to fraudulently keep him in ignorance, and how and when he first came to a knowledge of the matters alleged in his bill.' "

The principles here announced have been approved and followed, as binding upon the federal courts, by the Circuit Court of Appeals, in the Eighth Circuit, in Percy v. Cockrill, 53 Fed. 872, 4 C. C. A. 73; Kelley et al. v. Boettcher et al., 85 Fed. 55, 29 C. C. A. 14; Wyman v. Bowman, 127 Fed. 268, 62 C. C. A. 189. See, also, 2 Wall. 95, 17 L. Ed. 836. In Percy v. Cockrill, ante, the court say:

"The rule that length of time is no bar in equity to a suit for relief from an actual fraud or a constructive trust, clearly proved, which has been fraudulently and successfully concealed from the party aggrieved, has no application to this case subsequent to 1858. One of the qualifications of this rule is that the facts constituting the fraud or trust must have been fraudulently and successfully concealed from the injured party. Badger v. Badger, 2 Wall. 87, 92, 17 L. Ed. 836. And notice of facts and circumstances which would put a man of ordinary intelligence and prudence on inquiry is, in the eye of the law, equivalent to knowledge of all the facts a reasonably diligent

inquiry would disclose. 'Whatever is notice enough to excite attention, and put the party on his guard, and call for inquiry, is notice of everything to which such inquiry might have led. Where a person has sufficient information to lead him to a fact, he shall be deemed conversant with it.' Kennedy v. Green, 3 Mylne & K. 699, 722; Wood v. Carpenter, 101 U. S. 135, 141, 25 L. Ed. 807; Rugan v. Sabin (decided by this court December 6, 1892) 53 Fed. 415, 3 C. C. A. 578; Parker v. Kuhn, 21 Neb. 413, 421–426, 32 N. W. 74, 59 Am. Rep. 838; Wright v. Davis, 28 Neb. 479, 483, 44 N. W. 490, 26 Am. St. Rep. 347."

In Wyman v. Bowman, ante, the court say:

"Has the complainant been guilty of such laches that he may not invoke the aid of a court of equity? Courts of chancery are not bound by, but in the application of the doctrine of laches they usually act or refuse to act in analogy to, the statute of limitations relating to actions at law of like character. Under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law. But if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it. When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the bill, or by his answer, that extraordinary circumstances exist, which require the application of the doctrine of laches. And when such a suit is brought after the statutory time has elapsed, the burden is on the complainant to show, by suitable averments in his bill, that it would be inequitable to apply it to his case."

In Kelley v. Boettcher, ante, the whole subject is more elaborately discussed by Judge Sanborn, and the authorities there cited.

It will be seen from reading the bill that the complainant has wholly failed to bring itself within the principles announced in these opinions. The suit, therefore, cannot be maintained, because it is stale, within the rule announced above, and the bill must be dismissed at the cost of the complainant.