JAMES M. PARKER, APPELLEE, V. NORMAN A. KUHN
ET AL., APPELLANTS.

1. **Statute of Limitations:** FRAUD. An action for relief on the ground of fraud may be commenced at any time within four years after a discovery of the facts constituting the fraud, or of facts sufficient to put a person of ordinary intelligence and prudence on an inquiry, which, if pursued, would lead to such discovery.

2. ————: REDEMPTION. An action by a junior encumbrancer to redeem land sold at execution or judicial sale, being an action for relief other than those specifically mentioned, must be brought within four years after the cause of action shall have accrued.

APPEAL from the district court of Douglas county. Heard below before NEVILLE, J.

*H. D. Estabrook,* for appellants.

*George W. Doane,* for appellee.

COBB, J.

This is an action in the nature of *quia timet,* brought by the appellee against the appellants in the district court of Douglas county for the purpose of quieting his title in and to the real property described in the petition.

The plaintiff alleged that he is the owner in fee of said lands, that he acquired the title to the same and took actual possession thereof, and has for about twenty years last past remained in the actual, undisputed, notorious, and adverse possession of said lands, claiming title thereto against all the world. That he has erected on a portion of said lands large and valuable improvements; that he has during a portion of said time had a considerable part of said lands under cultivation, and still has; that for many years he occupied a portion of the said lands as his home and the

same is still occupied by a part of his family.    That plaintiff acquired title to said lands by virtue of certain judicial proceedings instituted against the Florence Land Company, resulting in decrees rendered on the 14th day of February, 1860, in all except one case, and in that on the 21st day of November, 1862, ordering sale of these lands in foreclosure of certain mortgages and deeds of trust given by said Florence Land Company, and that plaintiff was the purchaser at said sales and received deeds in fee simple for said lands.

That the only title under which the said defendants claim any interest in said lands is by virtue of a certain judgment obtained at the October term, 1859, of said court by John M. Kuhn against the Florence Land Company, execution issued thereon and sheriff's sale of the same on the 23d day of February, 1860, at which sale John M. Kuhn was purchaser.    That no steps toward a confirmation of said sale were ever taken until within the year last past, when John M. Kuhn made a quit claim deed of said lands to his son Norman A. Kuhn, one of the defendants: That the defendants Kuhn and Estabrook, conspiring together to cast a cloud upon the title of plaintiff to said lands, made application and obtained an order for confirmation of said lands without notice to any person whatever, and caused deeds to be executed for said lands under said execution sale to John M. Kuhn.    That said judgment and any lien acquired thereunder were subsequent to the liens of the said mortgages and were subject to the decrees of foreclosure entered thereon.    That in the last of said proceeding for foreclosure of one of said mortgages, said John M. Kuhn was made a party defendant and appeared and filed his answer and took testimony therein, and a final decree was entered therein in which, among other things, it was found that whatever interest the said John M. Kuhn had or pretended to have in said mortgaged premises was subject and subsequent to the interest of the said complain-

ants by virtue of said mortgage, which decree remains un-
reversed. That after the above narrated proceedings de-
fendant Kuhn, on or about the ... day of ......, 1880, made
to defendant Estabrook a deed conveying to him a portion
of the lands by quit claim. Thereupon they together con-
veyed to the defendants Rasmussen, Tiedeman, and Priess
a portion of said lands, which said portion of said lands
was covered with timber; that the same was so conveyed
as the result of a conspiracy to enable the parties last named
to cut the timber from said land and thereby deprive it of
its value.

That plaintiff is informed and believes that said defend-
ants Kuhn and Estabrook are making efforts to dispose of
other portions of said lands and thereby cast a cloud upon
the title of plaintiff thereto.

With other allegations for the purpose of obtaining an
order of injunction against the defendants, and a prayer for
judgment cancelling and declaring null and void the said
conveyances of the defendants and removing all cloud cre-
ated thereby from said lands, declaring the plaintiff's title
thereto to be clear and perfect, etc., and for general relief.

The defendant Tiedeman answered said petition, denying
each and every allegation thereof, except that Norman A.
Kuhn on or about the 9th day of December, 1880, for a
valuable consideration conveyed (describing a tract of land
the same as in the petition) to J. K. Rasmussen and John
Tiedeman, alleging that said grantees purchased said land
in good faith and without any knowledge of any claim to
the same by the plaintiff; that they thereupon entered upon
the land and proceeded to cut timber therefrom and had
open and notorious possession thereof until the plaintiff by
his agents drove them off with threats and force of arms.

That the deed conveying the said land was recorded,
etc. That on the 29th day of January, 1881, Rasmussen
conveyed all of his right, title, and interest to said lands
to John Tiedeman, with prayer that defendant may be

adjudged to be the owner in fee simple of said lands, etc., and for general relief.

The defendant, Norman A. Kuhn, also answered, denying each and every allegation contained in the plaintiff's petition, except as otherwise expressly admitted. He also alleged that he is the owner in fee simple of the property described in the plaintiff's petition, "that these lands are vacant and unoccupied, and have been so for twenty years last past, except a few acres upon which plaintiff has erected certain buildings. That the pretended title of plaintiff is null and void as against this defendant, for that the mortgage under which it was executed was made without authority, of which the plaintiff had notice. For that plaintiff was a judgment purchaser without notice of said mortgage, said mortgage never having been recorded. For that the said mortgage was made to defraud the creditors of the said Florence Land Company, of which plaintiff had notice."

As evidence of fraud, defendant alleges the following facts:

1. That said company was greatly embarrassed at the time of said loan.

2. That it pledged all of its property as security for said loan.

3. That said plaintiff was authorized to borrow at twenty per cent interest, and after his authority expired loaned the money himself at forty per cent.

4. That the money so loaned was not used by said company for the payment of its debts, but was converted by the stockholders.

5. That the president of said company acknowledged the deed of trust as notary.

6. That said mortgage was made as an absolute deed with a bond of defeasance, the deed only being recorded.

7. That said plaintiff was a member of said company, and virtually executed a mortgage to himself.

8.   That there were a great many suits pending against said company at the time of the making of said mortgage.

9.   That said mortgage was made secretly, and never recorded.

10.   That said loan was for payment of warrants to pre-empt the lands by the party, and that said mortgage was void on that account.   That said John M. Kuhn was never made a party to any foreclosure proceedings; that he authorized no one to contest said mortgage; that he always believed himself to be the owner of said lands.

That he is, and has been for the twenty years last past, a non-resident of the state of Nebraska, with no means of knowledge of suits pending in the courts of Nebraska.

Wherefore he asked judgment that the title to said lands be decreed in him; and if said mortgage of Cook, Sargent and Parker was valid and binding upon said defendant that he may be permitted to redeem therefrom, and for general relief.

The plaintiff replied to the answer of the defendant, Tiedeman, specifically denying each and every allegation of defense therein stated.

The plaintiff also replied to the answer of the defendant, Norman A. Kuhn, denying each and every allegation contained in the second defense of said answer.   Plaintiff also in his said reply says: "That in a certain action begun and prosecuted in the district court of Douglas county, in which Ebenezer Cook, George B. Sargent, and James M. Parker were plaintiffs, and the Florence Land Company and others defendants, John M. Kuhn, from from whom the defendant, Norman A. Kuhn, derived all the interest or title which he has or claims in any of the real estate described in the petition filed herein, appeared as a party defendant, and filed his answer, setting up the same matters substantially which are alleged by the defendant Kuhn in the second defense in his answer.

"That a decree was rendered in said cause in favor of

27

Cook, Sargent, and Parker, finding all of the equities of said case with said complainants. It ordered, adjudged, and decreed, among other things, that the mortgaged premises should be sold, and that the master should make a deed to the purchaser, who should be let into the possession of the premises on production of said master's deed; further, that the purchaser at such sale should take and hold such premises absolutely freed and released of all claims or interest of the defendant, John M. Kuhn, and all other persons who may have acquired any interest therein during the pendency of said cause, and that the entire right, title, and interest of the Florence Land Company should be by such sale vested in such purchaser. Plaintiff says further, that he became the purchaser of the lands at the sale made under this decree, and afterwards received the master's deed therefor, and was let into possession of the lands, claiming title thereto for more than twenty years last past as stated in petition. Plaintiff therefore says that all the matters alleged by way of defense in the said answer have been already adjudicated between the plaintiff and the grantor of the said defendant, and that the defendant is barred from again litigating the same in this action.

" Plaintiff states further that the rights alleged and claimed by the defendant Kuhn in the second defense of his answer, and by reason whereof he claims affirmative relief therein, did not accrue to the defendant or his grantor at any time within ten years before the commencement of this action, or before the filing of the answer herein ; therefore the defendant is barred by the statute of limitations of this state from alleging or receiving any advantage from any of the matters contained in his second defense.

" Plaintiff says further that the facts stated in the second defense of the answer are not sufficient to constitute any defense in favor of the defendant to the relief prayed for by the plaintiff in his petition, or to entitle him, the de-

fendant, to any relief against the plaintiff, and he prays the same benefit of this reply as if taken advantage of by way of demurrer, and he therefore prays relief as in his petition," etc.

At the close of the pleadings there is printed in the abstract the following : "Note. Defendants admit that plaintiff has shown a connected chain of title in himself to all the lands here in dispute so far as the records are concerned. Therefore to save encumbering the records, numerous patents, deeds, and court records in foreclosure cases showing this chain of title from the U. S. to plaintiff, defendants admit to be regular upon their face and admit all inferences to be drawn from such regularity ; all exhibits to this point will be marked 'admitted.'

" Defendants admit that said court proceedings are in due form and substance in all the cases of *Cook, Sargent, and Parker v. The Florence Land Company,* and of *Hays v. The Florence Land Company,* identical with the proceedings as shown in exhibit G, the description of the land being the only difference."

The cause was tried to the court with a finding and decree for the plaintiff, and is brought to this court by the defendants by appeal.

The testimony is very voluminous, the abstract of which fills forty-one closely printed pages. Therefore, even were it necessary, it would be impossible to set out in this opinion more than the briefest summary of it. But I do not think it necessary. By the note 'or stipulation above copied the defendants admit the paper or record title to all the lands involved in the suit to be in the plaintiff, and to be regular on its face. This title as to nearly all of the lands had its inception in mortgages, or conveyances found and held by the district court to be mortgages, executed and dated in 1857, and was perfected by legal proceedings and a master's deed in 1860 ; and as to the balance of the lands it had its inception in a mortgage executed in 1859, and

was consummated by legal proceedings and master's deed in 1863. The plaintiff in and by his reply to the answer of the principal defendant pleads and invokes the protection of the statute of limitations.

The language of the statute of limitations, taken in its literal sense, limits the time in which actions may be commenced after the accruing of the cause of action, or the right to enforce which the action is brought only, but it applies equally to the same facts or rights when they are plead as a defense or counter claim or in the nature of a cross-action. That part of the code of civil procedure from section 5 to section 22, both inclusive, is usually referred to and known as "the statute of limitations." This statute prescribes the time within which actions may be brought for the redress of every class of wrongs and the enforcement of every species of rights provided for in the civil code, and it is worthy of notice that the longest time prescribed within which any action can be commenced " after" the cause of action shall have accrued" is ten years.

The sections of the above statute especially applicable to the case in which it is here invoked are sections 6 and 12. Section 6 provides that " An action for the recovery of the title or possession of lands, tenements, or hereditaments can only be brought within ten years after the cause of such action shall have accrued," etc. Section 12 places within the class of cases which by the previous section are required to be brought within four years " after the cause of action shall have accrued," the following: "An action for relief on the ground of fraud, but the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud."

I do not deem it necessary or expedient to follow counsel to the discussion of the question as to whether the above statute applies to equity cases. The language of the clause last above quoted seems to me to be conclusive that it was intended to apply to cases where relief is sought in equity,

even if it can be conceived that its application is not confined to such cases. The defendant Kuhn, being sued in a court of equity, seeks relief not only against the case alleged against him by the plaintiff, but also prays both specific and general relief against the plaintiff " on the ground of fraud." In this state all courts of general jurisdiction are courts of equity. The system of procedure under the code is patterned after that formerly prevailing in courts of equity rather than that prevailing in courts of law. The statute in its terms applies generally to suits in such courts " for relief on the ground of fraud;" it must therefore be held to be applicable to the case at bar.

There is an apparent conflict in the authorities as to when the statute, in cases like the one which we are now considering, commences to run. This question has been twice presented to this court and to some extent considered.

The case of *Blake v. Chambers,* 4 Neb., 90, was an action for the fraudulent misapplication of trust funds by an executor and to subject certain real property into which such trust funds had been converted, to the payment of the plaintiff's claims against the testator. Among other defenses the defendant invoked the statute of limitations. In delivering the opinion of the court, then C. J. LAKE said: "As to the statute of limitations, on which some reliance seems to have been placed, it is well settled in courts of equity in cases like the one under consideration, that the statute will not commence to run until the discovery of the fraud. And in this state such is the statutory rule. General Statutes, 525, sec. 12. In this case it is expressly alleged that this fraudulent misapplication of the assets of the estate was not discovered until after the first day of January, 1874, so that in any event the statute did not begin to run until after that time, which was but a few days prior to commencing the action."

The other case was that of *Welton v. Merrick County,* 16 Id., 83. This action was brought to recover back money

paid to the county for taxes alleged to have been unlawfully demanded and received by the county in the year 1876 on certain unpatented railroad lands. The plaintiff alleged that he had no knowledge of the illegality of such taxes prior to the 1st day of December, 1881. The defendants' demurrer invoking the statute of limitations was sustained, which was assigned for error in this court.

The present Chief Justice, in delivering the opinion of the court, said: "It is very clear that there is no error in the ruling of the court below. Even if a cause of action had existed in favor of the plaintiff upon the payment of the taxes in controversy, it was barred by the statute of limitations. If a party with ordinary care and attention could have detected even fraud, he will be charged with actual knowledge of it; that is, the mere fact that a party is not aware of the existence of certain matters where there is no concealment, will not prevent the running of the statute of limitations. Angel on Lim., § 187. But in this case there is no pretense of fraud."

The point of divergence in these cases is readily seen to be where, in the latter case, the statute is declared to have commenced to run when the party with ordinary care and attention could have detected the fraud, rather than when it was discovered. None of the English cases can be relied upon as authority upon this point as to the true construction of the meaning of our statute. Their statutes of limitations, from that of 32 Henry VIII. to 3 and 4 William IV., exclusive of the latter, are silent on the subject of fraud or other matters of equitable jurisdiction, and the clause of the 26th section of the latter statute applicable to the point now being examined, is in the following language: "XXVI. That in every case of a concealed fraud, the right of any person to bring a suit in equity for the recovery of any land or rents of which he, or any person through whom he claims, may have been deprived by such fraud, shall be deemed to have first accrued at and not before the time at

which such fraud shall or with reasonable dilligence might have been first known or discovered," etc. This statute is, I think, still in force. At all events it was under it that *Vane v. Vane*, L. R., 8 Ch., 383, and *Chatham v. Hoar*, L. R., 9 Eq., 571, cases cited in the note to 2 Story's Eq. Jur., 13 ed., § 1521, as "the more exact rule" were decided. That the more exact rule under that statute is that the statute commences to run at "the time at which such fraud shall or with reasonable diligence might have been first known or discovered," cannot be doubted; but does it follow that it is the rule under a statute, like ours, which lacks the words to which that statute doubtless owes such construction?

Of the states of the Union, so far as my limited time enables me to examine, only Michigan, Wisconsin, Iowa, California, Minnesota, Kansas, and New York have, or had at the date of Mr. Angel's compilation, provisions in their statutes of limitations like our own. I do not find that such provision has been construed by the supreme courts of either of the three first mentioned states. The provision of the statute of California corresponding to that of our own which we are now considering, was considered and construed by the supreme court of that state in the case of *Boyd v. Blankman*, 29 Cal., 19. The case is long and much involved. I quote that part of the syllabus which is in point.

"An action for relief on the ground of fraud may be commenced at any time within three years after a discovery of the facts constituting the fraud, or of facts sufficient to put a person of ordinary intellegence and prudence on enquiry."

In the state of Minnesota, the case of *Commissioners of Mower County v. Smith*, 22 Minn., 97, an action brought by the county commissioners against a defaulting county treasurer, and in which the bar of the statute was pleaded, came before the supreme court by appeal. In the opinion the court say: "If the defendant, occupying as he did a fiduciary

relation to the county, converted the money, it was a fraud within the rule in *Cock v. Van Etten*, 12 Minn., 522, and the time limited for the commencement of the action began to run upon the discovery by the plaintiff of the fraud or notice to it of such facts and circumstances as, if investigated, would lead to such discovery." But strange enough, we find in the syllabus of the case written by the chief justice who wrote the opinion, the following: "Where there has been a fraudulent conversion, the time limited for the commencement of the action is to be counted from the discovery of the fraud."

The corresponding section of the statute of Kansas was in a manner before the supreme court of that state in the case of *Marbourg v. McCormick*, 23 Kas.; 38. The plaintiff in error, an agent of the McCormicks, in settling with them, had passed to them as genuine, and by false representations induced them to receive in payment of a balance due them on such settlement, a certain note of hand which proved to have been signed by him with the name of a fictitious person, and to be worthless. Upon suit by the McCormicks for such fraud, Marbourg plead the statute of limitations. Upon the trial the court gave the following instruction to the jury: "The time when the statute of limitations would commence to run would not be when mere suspicions were aroused, as that would not be in itsself regarded as a discovery, but as a circumstance leading to further investigation. So that in this case, if you find from the evidence as adduced any fraud on the part of defendant, the discovery of such fraud would be when the plaintiff had knowledge thereof, and not when they had mere suspicions only." The giving of this instruction was assigned for error in the supreme court. In the opinion of the court, Judge Brewer, after quoting said instruction, said: "The testimony upon which such instruction was founded was that of plaintiff's agent, that when he made settlement with defendant and received the note his

suspicions were aroused by noticing that it was all in the handwriting of the defendant, the maker not signing but making his mark; that thereupon he enquired of defendant concerning the maker, and received in reply the statements and representations heretofore noticed; that these suspicions were afterwards strengthened by the return of a letter uncalled for which he had directed to Patrick Flynn at Kennekuk. Now, in view of these facts, we think the instruction correct. 'Discovery of the fraud' is the language of the statute. That implies knowledge, and is not satisfied by mere suspicion of wrong. The suspicion may be such as to call for further investigation, but is not itsself a discovery. A party, even though his suspicions have been aroused, may well be lulled into confidence and take no action by such representations as were made. And it would be strange if a party who had disarmed suspicions by his representations could thereafter plead those suspicions as ground for immediate inquiry and action," etc.

Strange as it may seem, the precise point now before us does not appear to have been directly considered by the courts of New York. The statute is cited, however, and to some extent considered by the superior court of New York city in the case of *Mayne v. Griswold*, 9 New York Legal Observer, 25. I quote from the syllabus: "A bill filed for relief on the ground of fraud, which shows on its face that the fraud was committed more than six years before the filing of the bill, should not merely state in anticipation of the defense of the statute of limitations, that the fraud was discovered within six years, but show that it could not with reasonable diligence have been discovered sooner." To the same effect is the case of *Bertine v. Varian*, 1 Edwards' Ch., 343.

From these cases it would seem that none of the courts have been content to leave to the statute the plain import of its words. This may arise from the use of the word "discovery." This word, when used in reference to past

transactions or omissions can not have the same literal meaning as when applied to the discovery of a new continent or of a principle in physics. Fraud in a past and consummated transaction cannot be the subject of direct ocular or auricular discovery or knowledge. The discovery, then, of which the statute speaks, is of evidence or of evidential facts leading to a belief in the fraud and by which its existence or perpetration may be established, and not of the fraud itself as an existing entity.

If I am correct in the above, the inference follows that it is impossible to lay down any general rule as to the amount of evidence or number or nature of evidential facts which must be discovered before the statute will commence to run; therefore the rule supplied by the clause of sec. 26, chap. 27, 3 and 4 William IV. above quoted, and which seems to be followed more or less closely by the cases above cited, is after all, "the more exact rule."

To return to the case at bar. The frauds or facts alleged to have been fraudulent on the part of the plaintiff, and relied upon by the defendant Kuhn as a defense to the action, and as the ground of relief to himself, all occurred more than ten years, in point of fact more than twenty years, before the commencement of the action. The defendant is then barred of his defense unless it be true that down to a point of time less than four years before the commencement of the action, the defendant was in ignorance thereof or of any fact or circumstance connected therewith sufficient to put a person of ordinary intelligence and prudence upon inquiry in respect thereto.

Before entering upon an examination of defendant's evidence as to its application to the above proposition, our attention naturally turns to his answer. For if the fraud relied upon as a defense, or the facts and circumstances leading to a knowledge thereof, were first discovered by the defendant within four years next before the commencement

of the suit, that was a fact of very great importance, indeed the fact, if the position of defendant as to the fraudulent source of the plaintiff's title be conceded, upon which the case turns. It should therefore be distinctly alleged in the pleadings.

The case of *Godden v. Kimmell*, 99 U. S., 201, is authority to this point. In that case Mr. Justice Clifford, in delivering the opinion of the court, said: "Courts of equity, acting on their own inherent doctrine of discouraging for the peace of society antiquated demands, refuse to interfere in attempts to establish a stale trust except where the trust is clearly established, or where the facts have been fraudulently and successfully concealed by the trustee from the *cestui que trust*. Relief in such cases may be sought, but the rule is that the *cestui que trust* should set forth in the bill specifically what were the impediments to an earlier prosecution of the claim, and how he or she came to be so long ignorant of their alleged rights, and the means used by the respondent to keep him or her in ignorance, and how he or she first came to a knowlege of their rights:" citing *Badger v. Badger*, 2 Wall., 87, and *White v. Parmeter*, 1 Knapp, C. C., 227.

To the same effect is the case of *Bertine v. Varian, sup.* I quote from the syllabus: "Ignorance of rights and concealment will prevent the operation of the statute, but a party must set these up distinctly in his pleading. An averment that the complainants had not been in a situation to call the guardians or their representatives to an account is too indefinite."

The only allegation of defendant's answer tending to explain the reason of his ignorance of his rights is in the following words: "That he is and has been for the 20 years last past a non-resident of the state of Nebraska, with no means of knowledge of suits pending in the state of Nebraska;" nothing whatever as to the time when or how he first came to a knowledge of his rights or of the facts which led him

to such knowledge. The allegations of fraud against the plaintiff as contained in the defendant's answer are copied at length in the fore part of this opinion. As none of them relate to suits pending in the courts of Nebraska, or otherwheres, except the reference therein to suits pending against the Florence Land Company as evidence of its insolvency, it must be obvious that the defendant's want of knowledge of suits pending in the courts of Nebraska furnishes no reason for his ignorance of any one of the ten facts or groups of facts which he sets out as "evidences of fraud." And it is not stated, either in the answer or evidence, when he first discovered them, or either of them. I copy at length the abstract of the testimony of John M. Kuhn as given at the trial, with the observation that the defendant Norman A. Kuhn did not testify.

"I was plaintiff in the case of John M. Kuhn against the Florence Land Company; first came to Nebraska in the fall of 1856—the last week of December—and returned in April, 1857, and remained until the following October again. I then went back to Ohio, where I had been, and was never in Nebraska again until August, 1881; I remained in Ohio from 1857 to 1881; I suppose the debt was contracted and I obtained judgment against the Florence Land Company through money that I left in the hands of W. Y. Brown to invest for me; I understood from him that he was secretary of the company; there was no specific way pointed out for investing this further than that he was to invest it upon real estate security and personal individual indorsers. I got this note in this way. He came to Salem, Ohio, where I was living and have lived ever since, whatever date it was, in March, April, or May, I don't remember, of 1858, and negotiated with me about this note, and I gave it into his hands and never saw it since until I saw it a few days ago; I never saw the note from that day until the commencement of this suit; I could not say where I did learn that it was in judgment; it was prior to 1858; I think it

was in the winter of 1857 or 1858; I cannot remember the date; to the best of my knowledge I never authorized Mr. Seymour or any one else to appear for me as my agent in any case involving the lands in question between Cook, Sargent & Parker and the Florence Land Company—had I ever done so I think I would be apt to remember it; I was never notified or advised that any one put in an appearance in such a case for me; think I had no knowledge of it until the commencement of this suit, to the best of my recollection; not until the commencement of this suit did I first discover the fact that Mr. Parker held the lands in controversy, or a portion of them, as trustee of certain individuals by virtue of a secret trust; I have had no correspondent out here to instruct me as to the state of this property or its condition since 1859 or 1860, when Dr. Seymour went into the army; Mr. Brown told me that the mortgage given by the Florence Land Company to Sargent and Parker was fraudulent as to its character; I heard that there was fraud in giving the mortgage; I heard that some time prior to that note that I received from Mr. Brown as secretary of the company; I heard in what it consisted; I know nothing of my own knowledge in regard to this being a fraudulent transaction."

### CROSS-EXAMINED BY MR. DOANE.

"William Y. Brown became a brother-in-law to me after I went home from here in the fall of 1857, before this note was given; at the time he gave me this note he was my brother-in-law, lately married in my family, and he had been my agent for investing my money; in consideration for that note, in addition to the money directly left with him, I had other claims here that were owing to me when he came there in 1858; it was for the proceeds of the money that he had left in his hands that was coming to me; he gave me to understand that the Florence Land Company owed him, and I suppose it was for the purpose of settling

his indebtedness to me that he gave me the note on the Florence Land Company. I feel sure that he was indebted to me in that full amount at the time that note was given in 1858; I had no accounting with him at that time; that was the amount that was coming to me as the proceeds of that money that I left in his hands. I understand that the Florence Land Company owed him more; he said that $1,142 was the amount that he was owing me; he gave it as being the balance that he owed me; we did not come to any settlement at that time; it was not my understanding that the note was given by Brown to me so as to enable me to bring suit against the Florence Land Company to recover judgment against them rather than that Brown should bring suit against them on his own account; after taking the note I returned it to Brown to bring it here and get the money on it; Brown was managing my finances; I left this whole matter in regard to this suit and its collection with Brown; corresponded with Brown concerning it for some time; Dr. Seymour was my brother-in-law; after the judgment was obtained I think that William Y. Brown was not here at the time and he wrote me what was done and asked me to correspond with Dr. Seymour, and I did have some correspondence with him afterwards. Dr. Seymour wrote me about my having obtained a judgment against the Florence Land Company for so much, and that the lands were sold, and that John Hellman, who was sheriff of the county, wrote him that there was so much cost—I think $62.50—in the case, saying that if the costs were not paid until the June term the lands would be sold again for the costs. I paid the costs, and before the June term Seymour wrote me saying that the Florence Land Company was going to pay the claim. I don't know where I could find any of these letters; have not seen any of them since after the lands were sold; I looked over the letters before I came out here and burned bushels of them; it is possible I brought the correspondence relating to this

period with me; will look for them; when I wrote to Brown making inquiry about it he told me that he had employed Redick, and I think I wrote one letter to Redick about it. I have no idea of its date; it was after the suit was over. I did not know at that time of the pendency of the suit to foreclose the lien on the Florence Land Company's lands; I never received any letter from Redick & Briggs in regard to it. I wrote Redick after the foreclosure, asked him how the matter stood. I knew that he was the proper person to refer to to get information. I think James H. Seymour appeared for me voluntarily or by the advice of W. Y. Brown in the suit brought to enforce my rights. I had some correspondence with him about the matter after it was over; I could not tell at what time the first correspondence took place; think it was after the suit was over—I mean the foreclosure of the mortgage after I had obtained judgment against them. I could not say how soon after; I only know of one foreclosure suit; I don't think I heard anything of the pendency of this suit until after it was put into effect; never paid any fees for the services of Redick in this suit; no claim was ever presented. James H. Seymour is now dead; he was in the army. All, that I knew in regard to this matter was before he went into the army. It was my understanding that he went with the First Nebraska Regiment soon after the opening of the war. If Mr. Redick had succeeded in getting the money out of this land I would have supposed it was coming through W. Y. Brown, and I would have accepted the money as a matter of course. I would say that whatever W. Y. Brown did in the matter of enforcing my claim against the Florence Land Company he did as my agent. I knew nothing about land, and was supposed to rely upon him."

RE-DIRECT BY MR. SIMERAL.

"Mr. Brown gave me to understand that he would go on and collect that note; he signs himself attorney on that

note for the company. I never thought of his employing any other counsel than himself, and supposed there would be no necessity; the substance of what he said is that he would go on and collect that note, and that it was sure to me."

BY MR. ESTABROOK: "He said that there was some mortgages that would have to be contested; he didn't say he would .do it; I could not say whether it was at the time I gave him the note, or previous; I could not say concerning the conversation between Brown and myself, except that he would get the money for me and that it was a very sure thing; he tried to impress that upon my mind very strongly—that it was sure."

The only fact or circumstance stated in the testimony to have been discovered by the said John M. Kuhn at any time, is that the plaintiff held the lands in controversy, or a portion of them, as trustee of certain individuals by virtue of a secret trust. This he says, he discovered after the commencement of the suit. This refers to the fact testified to by the plaintiff that he bid off the lands at the mortgage sales in his own name, but in' point of fact for the benefit of all the members of the firm of which he was a member, which was the · owner of the mortgages, and the members of which were the plaintiffs in the suits in which the mortgages were foreclosed, and the sale of said lands made, and that he afterward bought in the respective shares of his partners and co-plaintiffs in said actions, in said lands. The purchase of these lands in his own name by the plaintiff constituted a trust in favor of his co-partners, which had he denied, equity would enforce, but it constituted no trust in favor of any other creditor of the mortgagor. If there was any fraud in the transaction, it was in the making of the notes and mortgages by the Florence Land Company. If the plaintiff and his co-mortgagees, or any of them, were cognizant of such fraud, then it must be admitted that the foreclosure of the mortgages,

including the sale of the lands, was but a continuing fraud; but it had its inception, if at all, in the original transaction. Of this the defendants' grantor had notice, according to his testimony, twenty-three years before the commencement of this action, and, indeed, before the receipt by him of the note of the company upon which the judgment was rendered under which defendant claims.

All of the transactions alleged to have been fraudulent had occurred more than four years before the commencement of the action, and the defendant, or his grantor, having knowledge of such fraud (if any there was), or of such facts in connection therewith as would put a person of ordinary intelligence and prudence upon inquiry that would have led to such knowledge, the defendant is barred by the statute.

The defendant claims, as an alternative relief, that he should be allowed to redeem the lands in question from the mortgage sales.

As to a portion of the lands, it is difficult, if not impossible, to learn from the abstract whether the judgment under which defendant claims was rendered prior to the commencement of the foreclosure proceedings or not. As to the other portion, defendant's grantor was a party defendant, and appeared, answered, and defended by attorney. It is true that the authority of the attorney to appear for John M. Kuhn is denied.

The claim of a party of the right to redeem lands sold on execution or at judicial sale, on the ground of his being the holder of a subsequent lien, and has not had notice of the proceeding under which the land was sold, is doubtless a matter within the jurisdiction of a court of equity. It would be an action for relief, and therefore falls within section 16 of the statute of limitations, and must be brought within four years after the cause of action shall have accrued, so that the bar of the statute invoked by the plaintiff is equally applicable to the defendant's answer viewed as a bill to redeem.

28

In any view of the case, we must hold, as we do, that the decree of the district court be and it is affirmed.

DECREE ACCORDINGLY.

THE other judges concur.