WYMAN v. BOWMAN et al.

(Circuit Court of Appeals, Eighth Circuit. January 11, 1904.)

No. 1,935.

**1. CORPORATIONS—SUBSCRIPTION FOR STOCK—LIABILITY OF ORIGINAL SUBSCRIBERS.**

The liability of the original subscribers for stock under section 4, art. 11b, of the Constitution of Nebraska, which provides that the original subscribers shall be individually liable for claims against the corporation to the extent of their unpaid subscriptions after the corporate property has been exhausted, arises from the agreement of subscription, and is contractual.

**2. SAME—PROVISION DOES NOT CREATE NEW CONTRACT—SALE OF STOCK—CONTINUING GUARANTY.**

The effect of this provision is not to create a new obligation or liability, but, in case of a sale of the stock by the subscriber, to modify his old contract to pay on the call of the board of directors into a guaranty to pay the debts of the corporation, to the amount of the unpaid subscription, after the corporate property has been exhausted.

**3. SAME—LIABILITY ENFORCEABLE BY ITS RECEIVER OR REPRESENTATIVE.**

This guaranty, like the original contract, is an agreement with, and the property of, the corporation—held by it to pay its debts. It passes to a receiver of its property, or other proper representative of the corporation, and may be enforced by him.

**4. SAME—SURRENDER OF CERTIFICATES—SUBSTITUTION OF NOTES—EFFECT.**

The surrender by the original subscriber of his certificates of stock, the issue of new certificates to a purchaser, and the substitution of the secured notes of the latter for the unpaid part of the subscription in place of the notes of the former, do not evidence a rescission of the contract, or relieve the original subscriber from the effect of the constitutional provision.

**5. JURISDICTION IN EQUITY—AVOIDANCE OF RELEASES AND ASSIGNMENTS FOR FRAUD.**

The avoidance of releases of obligations and of assignments of choses in action for fraud is a subject of jurisdiction in equity.

A bill to enforce payment of subscription for stock, a chief part of the relief sought in which is the avoidance, as a fraudulent preference, of releases and assignments of a large part of the subscriptions, evidenced by the records of the board of directors of the corporation, upon which the defendants rely to establish their defense of payment, presents a subject of equitable cognizance.

**6. SAME—MULTIPLICITY OF SUITS.**

There is no hard and fast rule by which jurisdiction in equity on the ground of the avoidance of a multiplicity of suits may be determined.

But whenever there is a common and decisive point of litigation between a complainant and several defendants separately liable either at law or in equity, the complainant's remedy at law is not as prompt, practical, and efficient to attain the ends of justice as the suit in equity, the convenience of the complainant is not overcome by the greater inconvenience to the defendants of a single suit, and a suit in equity against all the defendants will avoid several actions at law or suits in equity involving similar questions, the jurisdiction of a court of equity may be successfully invoked.

---

¶ 1. Stockholders' liability to creditors in equity, see note to Rickerson Roller Mill Co. v. Farrell Foundry & Machine Co., 23 C. C. A. 315; Scott v. Latimer, 33 C. C. A. 23.

127 F.—17

**7. SAME—BILL AVOIDING NINE ACTIONS AT LAW.**

A bill to collect unpaid subscriptions of nine defendants separately liable at law may be maintained on the ground that it avoids a multiplicity of actions at law, where the defendants have a community of interest in the questions of law and fact presented by the controversies, and the convenience of all parties will be better subserved by determining these questions in a single suit in equity than by deciding them in nine actions at law.

**8. CORPORATION—SUBSCRIPTION—CONDITION WAIVED.**

One who on a condition subscribes for stock of a corporation or purchases property waives compliance with, and estops himself from asserting, the condition, by executing the contract, accepting, using, and selling the stock or property, without requiring the condition to be fulfilled.

**9. RES ADJUDICATA—ISSUES NOT LITIGABLE IN FORMER SUIT.**

Issues involving the merits of a controversy, which were presented by the pleadings, but were not litigable in a former suit between the same parties, are not concluded by a judgment or decree therein.

**10. LIMITATIONS—ACTION TO ENFORCE ORIGINAL SUBSCRIBERS' LIABILITY.**

The cause of action to enforce the liability of an original subscriber under section 4, art. 11b, of the Constitution of Nebraska, does not accrue until the claims against the corporation are judicially ascertained, and the corporate property is exhausted. An action commenced August 7, 1902, on an original subscription made in 1883, when the corporate property was first exhausted in 1901, was not barred by the limitation of five or ten years contained in section 3447 of the Code of Civil Practice of Iowa of 1897.

**11. LACHES—ANALOGOUS LIMITATION AT LAW.**

Under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous limitation at law. But if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer period, or to forbid its maintenance after a longer period, than that fixed at law, the chancellor will not be bound thereby, but will determine the extraordinary case in accordance with the equities which condition it.

**12. SAME—BURDEN ON HIM SEEKING APPLICATION.**

When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the bill, or by his answer, that extraordinary circumstances exist which require the application of the doctrine of laches. And when the suit is brought after the statutory time, the burden is on the complainant to show in his bill that it would be inequitable to apply it to his case.

**13. CORPORATIONS—CONTRACT WITH DIRECTORS—PREFERENCES.**

A contract between a corporation and a majority of its directors, whereby the latter advances or loans money to the former to pay its debts, some of which are owing to the latter, and whereby the former gives the latter a preference over other creditors, is not void, but voidable at the option of the creditors or stockholders of the corporation.

**14. SAME—CONTRACT—RESCISSION—RESTORATION OF CONSIDERATION.**

A court of equity will not, at the suit of a receiver of a corporation, rescind or avoid a transaction between the corporation and four of its directors whereby the former and its creditors received the amount of an assessment upon its stock, and proceed to enforce the collection of the amount of this assessment again from the original subscribers to the stock, while the corporation and its creditors retain the first payment and all its benefits. He who seeks equity must do equity.

¶ 8. See Corporations, vol. 12, Cent. Dig. § 276.

**15. Same—Contracts with Officers—When Valid.**

Contracts and transactions between individuals and corporations of which they are directors or officers, which are fair and are made in good faith, which do not secure to the individuals an undue or unjust benefit or advantage, and in which the interest of the individuals and the duty of the officers work in unison for the welfare of the corporation, are valid and enforceable in law and in equity.

**16. Same—When Invalid.**

Contracts and transactions between individuals and corporations of which they are directors or officers which are unfair, in which the individuals have secured an undue or unjust advantage, in which an antagonism between the interest of the individuals and the duty of the officials has resulted in the triumph of the former, are voidable at the option of the corporation, its creditors or stockholders.

**17. Same—Preference of Creditors by—When Valid.**

A solvent corporation may lawfully prefer one creditor to others.

Such a preference may be lawfully made by a corporation, although its liabilities exceed its assets, if it is made in good faith, and its officers are not aware, and would not be aware by the exercise of reasonable prudence and diligence, that its continuance as a going concern must soon cease, or that its liquidation is imminent.

**18. Same—When Voidable.**

A preference by an insolvent corporation of one creditor to others is voidable by its creditors or stockholders if it was made in bad faith, to give the preferred creditor an undue advantage over others, at a time when the officers of the corporation were aware, or by the exercise of reasonable prudence or diligence would have been aware, that the liquidation of the corporation was imminent, or that it probably could not continue its active existence for any considerable time.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the Southern District of Iowa.

This is an appeal from a decree which dismissed a bill in equity exhibited by Albert U. Wyman, as receiver of the property of the Nebraska Fire Insurance Company, against Thomas Bowman, Millard F. Rohrer, Fayette O. Gleason, Eli L. Shugart, Henry C. Laub, John M. Campbell, John Y. Stone, and George W. Kingsnorth, who were once stockholders of the insurance company, to compel them to pay the unpaid part of their subscriptions to the stock of that corporation, which was alleged to be 50 per cent. thereof. When the decree was rendered, the suit against Kingsnorth stood upon demurrer to the bill, while the other defendants had answered, a replication had been filed, testimony had been taken, and there had been a final hearing. The case will be considered upon the evidence, which disclosed these facts:

The Nebraska Fire Insurance Company, which prior to 1890 was the Nebraska & Iowa Insurance Company, was a corporation of the state of Nebraska, organized in 1883. In March of that year each of the defendants subscribed for certain shares of its stock, paid 50 per cent. of the amount of his subscription, and gave to the corporation his promissory note for the unpaid portion thereof, payable on demand, as and when the board of directors should designate. In 1887 each of the defendants sold his stock to a solvent purchaser, who substituted his promissory note for that of his vendor, the original certificates of stock were surrendered and canceled, and new certificates were issued to the purchasers. In 1890, and in the early part of 1891, L. B. Williams, S. R. Johnson, George F. Wright, and M. J. Burns were the directors of the insurance company, and owned more than 600 shares of its stock, which consisted of 1,000 shares. The company was insolvent. On April 13, 1891, the indebtedness of the company then due was about $41,625, and the board of directors made an assessment of 41.625 per cent. on the stock of the corporation. Williams, Johnson, Wright, and Burns at and prior to this time paid to the company $41,612.06, and the money thus paid was used to pay the debts of

the corporation. For this payment they were credited with the payment of the assessment on the stock they owned, and were given assignments of the certificates of the assessments upon the stock of the other stockholders who would not pay their assessments. The bill alleged, and the answer denied, that this payment upon the stock was fraudulent and void as to the creditors of the corporation, because it gave a preference to those who paid it over other creditors of the corporation. In 1892, on the petition of a stockholder, and on the intervening petition of the auditor of the state of Nebraska, the insurance company was by the district court of Douglas county, in the state of Nebraska, adjudged to be insolvent, was dissolved, and the complainant was appointed receiver of its property, and directed to collect and distribute its assets, and to prosecute such suits as any creditor of the corporation could maintain. He proceeded to sell the property, collect the credits, and distribute the proceeds of the assets of the corporation, until, on September 10, 1901, he had exhausted them.

Section 4 of article 11b of the Constitution of Nebraska reads: "In all cases of claims against corporations and joint stock associations, the exact amount justly due shall be first ascertained, and after the corporate property shall have been exhausted the original subscribers shall be individually liable to the extent of their unpaid subscription, and the liability for the unpaid subscription shall follow the stock." On August 7, 1902, the receiver exhibited the bill in this case to enforce the liability of the defendants as original stockholders of the insurance corporation under their contract of subscription, in view of the foregoing section of the Constitution of the state of Nebraska. On January 6, 1903, the complainant, Wyman, was by order of the court below appointed ancillary receiver as of a date just before the commencement of this suit, with the same powers in that court that he has in the state court from which he received his original appointment.

E. Wakeley (Arthur C. Wakeley, A. T. Flickinger, and I. N. Flickinger, on the brief), for appellant.

Charles M. Harl (Finley Burke, Emmet Tinley, Jacob Sims, Constant R. Marks, and David Mould, on the brief), for appellees.

Before SANBORN and VAN DEVANTER, Circuit Judges, and HOOK, District Judge.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Section 4 of article 11b of the Constitution of Nebraska declares that the original subscribers to the stock of a corporation in that state shall, after the corporate property is exhausted, be individually liable for its debts to the extent of their unpaid subscriptions. This liability is contractual. It rests on the agreement of subscription. Each subscriber, when he makes his contract to take and pay for the stock, agrees to assume and discharge all the legal obligations and duties of a stockholder. This provision of the Constitution of the state of Nebraska is necessarily read into, and becomes a part of, every contract of subscription to stock of a corporation of that state. By that contract each subscriber becomes liable to pay the unpaid part of his subscription, regardless of this constitutional provision. In its absence, by a sale of his stock to a solvent purchaser who undertakes to perform his agreement, he might terminate his liability. The effect of the provision is not to create any new obligation, but to prevent the original stockholder from relieving himself of his liability to pay his subscription until either it is fully paid, or all the debts of the corporation are satisfied. In its inception, the contract of subscription is an agreement

to pay the unpaid part thereof from time to time as it is called for by the board of directors of the corporation. After the original subscriber sells his stock, the contract and the liability remain, but they are modified. They become a guaranty to pay the unpaid part of the subscription only after the corporate property is exhausted. The original contract was with the corporation, and was a part of its property. The modified contract—the guaranty—though available for the benefit of creditors only, is still a contract with the corporation for the benefit of its creditors, and a part of its property, which its receiver or representative may lawfully enforce for the purpose of paying its corporate debts. Patterson v. Lynde, 106 U. S. 519, 520, 1 Sup. Ct. 432, 27 L. Ed. 265; Van Pelt v. Gardner, 54 Neb. 701, 711, 75 N. W. 874. This brief consideration of the nature of the liability which the complainant seeks to enforce will be of material aid in leading us through the maze of questions which this case presents.

The complainant is met at the threshold of his suit by the objection that a court of equity has no jurisdiction of it, because he has an adequate remedy at law in nine separate actions—one against each of the nine defendants. But one branch, and, indeed, the most important part, of the relief which the complainant seeks in this suit, is the avoidance, as a fraudulent preference, of the release of the assessment of 41.625 per cent. upon the capital stock of the corporation, held by Johnson, Williams, Burns, and Wright, on April 13, 1891, which was more than 600 out of a total of 1,000 shares, and of the assignment to them of the certificates of that assessment upon the stock of the corporation which they did not own, which releases and assignments are evidenced by the record of the meetings of the board of directors of the insurance company, and form the basis of one of the six defenses in this suit. The record of the meeting of the board of directors of April 13, 1891, shows that, by resolutions adopted by that board on that day, this assessment upon the stock held by Johnson and his associates was released and satisfied, and certificates of assessment upon the other stock of the corporation were assigned to them, in consideration of the loan by them to the corporation on that day of $41,612.06, and of the indorsement upon the promissory notes of the corporation evidencing that loan, delivered to them that day, of the amount of this assessment upon their stock. The defendants maintain that this transaction paid the assessment on the stock of Johnson and his associates, and divested the corporation and its creditors of all interest in the assessment upon the stock which they did not own, so that the defendants, as original subscribers, are no longer liable for this 41.625 per cent. of their subscription to the stock. On the other hand, the complainant pleads that this transaction was void as to the creditors of the corporation, because the company was then insolvent, and the effect of the transaction was to give a fraudulent preference in payment to creditors who were the directors of the corporation; and the complainant prays that all the proceedings relative to this matter be adjudged void, ineffectual, and inoperative to pay or to discharge any part of that assessment, as against him and the creditors of the insurance company. Upon its face, this transaction was lawful and valid. Even as to creditors, it was voidable only, not void. A solvent cor-

poration, in the ordinary course of its business, has the undoubted right to accept its own promissory notes in payment of subscriptions to its stock, or in payment of the purchase price for assignments of assessments upon its stockholders. At most, the creditors had but the option to affirm or to avoid the transaction. If they failed to attack it, it remained valid and binding.

If the transaction had been a simple payment of money of the corporation to themselves, as creditors, by its directors, so that they thereby obtained a preference in payment over other creditors, it might, indeed, have been disregarded in an action at law, in behalf of the other creditors, as fraudulent and ineffectual, without a suit in equity. But this transaction was more. If a preference was a part of it, the payment and release of the assessment upon a part of the stock, and the assignment of the certificates of the assessment upon the remainder, were also a part of it, and all the parts form but a single transaction. Before this affair could be disregarded, the release and the assignments must both be avoided, and the entire transaction must be rescinded. The relief which the complainant sought—the relief which was indispensable to his recovery of the 41.625 per cent. from the defendants—was the avoidance, for fraud, of the release of the assessments against the stock of Johnson and his associates, and the avoidance of the assignment of the certificates of the assessments against the other stockholders, which were evidenced by the record of the corporation. But the cancellation of assignments and releases for fraud is a subject of equitable cognizance, and the relief against the transaction of April 13, 1891, which was indispensable to the complainant's recovery of that portion of the subscription evidenced by the assessment of that date, presented ample ground for invoking the jurisdiction of a court of equity.

If, however, the concession were made that the complainant could have maintained nine separate actions at law—one against each of the nine defendants in this suit—and could in those actions have disregarded the releases and assignments, and have recovered the entire 50 per cent. alleged to have been unpaid upon the subscriptions, nevertheless the community of interest of the defendants in every question of law and of fact involved in the controversies presented by this suit, the inadequacy of the nine separate actions at law to attain the ends of justice, the greater convenience and less expense for all parties in the determination of the controversies here presented in a single suit in equity, are in themselves sufficient to sustain the jurisdiction of the court below on the ground that this suit avoids a multiplicity of actions at law. In support of the counter proposition, counsel for the defendants cite Hale v. Allinson, 188 U. S. 56, 23 Sup. Ct. 244, 47 L. Ed. 380, in which the Supreme Court sustained the dismissal of a bill in equity brought by a receiver against 47 stockholders to enforce their double liability for the debts of the corporation, which was imposed by the Minnesota statute, upon the ground that the liability of each stockholder was separate and independent, and was to the creditors only, and that the convenience of the complainant in enforcing their liability by a single suit was overcome by the greater inconvenience that would be entailed upon the defendants by such a course

of proceeding, in view of the fact that they were supposed to have different defenses to the alleged causes of action against them. The decision in that case is not conclusive here, because that was a suit to enforce a liability beyond the amount of the subscription to the stock, imposed by statute in behalf of creditors only. This is a suit to enforce the payment of subscriptions to the stock of the corporation for the purpose of paying the corporate debts. In that case the liability was directly to the creditors, and they alone, or their representative, could maintain an action to enforce it. In this case the liability is to the corporation, for the benefit of the creditors (Patterson v. Lynde, 106 U. S. 519, 520, 521, 1 Sup. Ct. 432, 27 L. Ed. 265; Van Pelt v. Gardner, 54 Neb. 711, 75 N. W. 874), and any shareholder who pays more than his proportion of the corporate debts may enforce contribution of his co-subscribers (Van Pelt v. Gardner, 54 Neb. 709, 75 N. W. 874). This fact alone presents a persuasive argument in support of a remedy by a single suit in equity. In that case there was no community of interest among the defendants in the controversies presented for litigation, and the convenience of the complainant in pursuing the single suit was overcome by the inconvenience of such a course to the several defendants. In this case there is a community of interest among the defendants in every question of law and of fact presented by the controversies, and the convenience of all parties will be better served by a determination of them here in a single suit, than by repeated decisions of them in nine separate actions at law.

In Hale v. Allinson, 188 U. S., at page 77, 23 Sup. Ct. 252, 47 L. Ed. 380, the Supreme Court, after reviewing many authorities, stated its final conclusion relative to this matter of jurisdiction in equity upon the ground of the avoidance of a multiplicity of actions at law or of suits in equity in these words:

"Each case, if not brought directly within the principle of some preceding case, must, as we think, be decided upon its own merits, and upon a survey of the real and substantial convenience of all parties, the adequacy of the legal remedy, the situations of the different parties, the points to be contested, and the result which would follow if jurisdiction should be assumed or denied; these various matters being factors to be taken into consideration upon the question of equitable jurisdiction on this ground, and whether, within reasonable and fair grounds, the suit is calculated to be in truth one which will practically prevent a multiplicity of litigation, and will be an actual convenience to all parties, and will not unreasonably overlook or obstruct the material interests of any. The single fact that a multiplicity of suits may be prevented by this assumption of jurisdiction is not enough, in all cases, to sustain it. It might be that the exercise of equitable jurisdiction on this ground, while preventing a formal multiplicity of suits, would nevertheless be attended with more and deeper inconvenience to the defendants than would be compensated for by the convenience of a single plaintiff; and, where the case is not covered by any controlling precedent, the inconvenience might constitute good ground for denying jurisdiction. We are not disposed to deny that jurisdiction on the ground of preventing a multiplicity of suits may be exercised in many cases in behalf of a single complainant against a number of defendants, although there is no common title nor community of right or interest in the subject-matter among such defendants, but where there is a community of interest among them in the questions of law and fact involved in the general controversy."

This court has repeatedly held—and that holding is sustained by the great weight of authority—that a bill in equity against several

defendants separately liable either at law or in equity may be maintained, in order to avoid a multiplicity of actions at law or of suits in equity, whenever there is a common and decisive point of litigation between the complainant and the defendants, the complainant has no remedy at law as prompt, practical, and efficient to attain the ends of justice as the suit in equity, and the convenience of the complainant in pursuing the single suit in equity is not overcome by the deeper inconvenience of such a course to the defendants. Prentice v. Duluth Storage Co., 58 Fed. 437, 7 C. C. A. 293; Kelley v. Boettcher, 85 Fed. 55, 64, 65, 29 C. C. A. 14, 23; Curran v. Campion, 85 Fed. 67, 70, 29 C. C. A. 26, 29; Watson v. Bonfils, 116 Fed. 157, 159, 53 C. C. A. 535, 537; Bailey v. Tillinghast, 40 C. C. A. 93, 99, 99 Fed. 801, 807; Mayor of York v. Pilkington, 1 Atk. 282; Lord Tenham v. Herbert, 2 Atk. 483; Louisville N. A. & C. Ry. Co. v. Ohio Valley Improvement & C. Co. (C. C.) 57 Fed. 42, 45; 1 Pomeroy's Eq. Jur. § 269; Osborne v. Wisconsin Central Ry. Co. (C. C.) 43 Fed. 824, 826. In the suit under consideration, every point of litigation between complainant and the defendants is common to all the latter. One of them has demurred to the bill, and eight have joined in a common answer. Their alleged liability is based on their signatures to the same agreement of subscription. They all defend on the ground that their subscriptions were conditional, that their contracts were rescinded, that 41.625 per cent. of their subscriptions was paid by Johnson and his associates, that the questions presented in this suit are res adjudicata, that the complainant has no legal capacity to maintain the suit, and that the court below had no jurisdiction in equity. The same facts proved by the same evidence condition the defenses of each of the defendants, and the same questions of law are presented by each of them for our determination. Why does not this suit prevent a multiplicity of actions at law, and give to the complainant a more efficient and practical remedy, without inconvenience to the defendants, than nine separate actions at law could give. The remedy at law which will preclude the maintenance of a suit in equity must be "plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." Boyce v. Grundy, 3 Pet. 210, 215, 7 L. Ed. 655; Oelrichs v. Spain, 15 Wall. 211, 222, 223, 21 L. Ed. 43; Preteca v. Land Grant Co., 50 Fed. 674, 1 C. C. A. 607; Foltz v. Railroad Co., 60 Fed. 316, 322, 8 C. C. A. 635, 641; Hayden v. Thompson, 71 Fed. 61, 63, 17 C. C. A. 592, 594. Would nine actions at law, in which the same questions of law and fact would be tried nine times upon the production and reproduction of the same evidence before nine different juries, be as efficient and prompt or as practical a means to determine the questions here at issue, and to attain the ends of justice, as this single suit in equity? The question is its own answer. Is there any deeper inconvenience to the defendants than would be compensated for by the convenience of the plaintiff in pursuing this remedy? None is proved; none can be conceived. Indeed, the single suit in equity entails less expense, less labor, and less trouble upon the defendants by as much as it is less expensive and troublesome to try a single suit in equity than it is to try nine actions at law, involving the same controversies, conditioned by the same evidence. The de-

fendants have a common interest in every material question of law or of fact involved in the controversy in this suit. The remedy of the' complainant by this proceeding in equity is far more efficient, prompt, and practical to attain the ends of justice, and much less expensive and inconvenient to all the parties to the controversies, than nine actions at law would be. The case falls far within the principle that a suit in equity may be maintained to avoid a multiplicity of actions at law, and the decree of dismissal cannot be sustained on the ground that the cause of action stated in the bill was not of equitable cognizance.

The next objection to the maintenance of this suit is that the complainant is a foreign receiver appointed by the district court of Douglas county, in the state of Nebraska. But he is also a domestic receiver appointed by the court below, and vested with all the powers and authority in the Southern District of Iowa which were conferred upon him in Nebraska by the order of the district court of Douglas county. If he is a foreign receiver, he is also a domestic receiver, and in the latter capacity he may certainly lawfully maintain this suit.

It is said that this receiver has no legal capacity to sue here, because he takes only the property and causes of action of the corporation; and cases are cited in which it is held that an ordinary receiver does not take and cannot enforce the statutory liability of stockholders beyond their contract liability for their subscriptions, because such liabilities do not accrue to, or become the property of, the corporation or of its legal representative. Evans v. Nellis, 187 U. S. 271, 23 Sup. Ct. 74, 47 L. Ed. 173; Hale v. Allinson, 188 U. S. 56, 23 Sup. Ct. 244, 47 L. Ed. 380; Hancock National Bank v. Ellis (Mass.) 44 N. E. 349, 55 Am. St. Rep. 414; Republic Life Ins. Co. v. Swigert (Ill.) 25 N. E. 680, 12 L. R. A. 328. But the liability which this receiver seeks to enforce is not a liability which was imposed by statute, beyond that which resulted from the contract of subscription. It is a liability based upon, and arising out of, the agreement of the defendants with the corporation to pay for the stock they received. It is a liability to, and the property of, the corporation, held by it for the benefit of its creditors. The ordinary receiver appointed by a court which has jurisdiction of the corporation and of a petitioner who lawfully invokes the exercise of its powers takes all the property and choses in action of the corporation, and may lawfully enforce the collection of the latter by suits and legal proceedings. The liability of these defendants to pay their subscriptions for the stock after its sale remained a chose in action of the corporation, under the constitutional provision, and vested in the complainant, who had the legal capacity to enforce it by any proper action at law or proceeding in equity. Van Pelt v. Gardner, 54 Neb. 701, 711, 712, 75 N. W. 874; Wyman v. Williams, 52 Neb. 833, 836, 73 N. W. 285.

The contract of subscription signed by the defendants in 1883 provided that they agreed to take the stock of this insurance company "in consideration of each other's subscription to the capital stock for an insurance company in the state of Iowa and the state of Nebraska to be organized in both states separately and after organization to be consolidated." But no such consolidation was ever made. Upon this

fact the defendants base their claim that their subscription was conditioned upon the organization of the consolidated company, and that, as there was no compliance with this condition, they never became liable to pay their subscriptions. If, however, their subscriptions were subject to the condition which they plead, it was a condition for their benefit, a compliance with which they had the power to waive. In the face of a noncompliance with this condition, they received their stock from the corporation, paid 50 per cent. of their subscriptions, secured the payment of the remainder by their promissory notes, held and voted their stock for about four years, and then sold it to bona fide purchasers. One, under a conditional contract to purchase property, who completes the purchase, receives and sells the property, without requiring a compliance with the condition, thereby waives it, and estops himself from avoiding on its account the purchase or the legal liabilities which follow it. The defendants waived compliance with the alleged condition that the two corporations should be consolidated by their acceptance, use, and sale of the stock of the Nebraska Company, and it is too late for them now to present that condition as a defense to their liability to pay for that which they have received and used.

About the year 1887 the defendants sold their stock in the insurance company, in good faith, to solvent purchasers. Thereupon they surrendered their certificates of ownership to the corporation, and the latter surrendered to the defendants their promissory notes for the unpaid 50 per cent. of their subscriptions, and issued new certificates to the purchasers, who gave to the company their promissory notes, with sureties, as required by the statutes of Nebraska, for the unpaid 50 per cent. of the subscriptions. Counsel for the defendants invoke the principle that a corporation may by agreement make, modify, and rescind contracts, and receive property in payment of obligations to it; and they cite a sentence in section 175 of 2 Waterman on Corporations, which reads:

"When stock has been once issued, and afterward relinquished to the corporation, a party to whom it is then reissued becomes a stockholder, as an original subscriber, and not as an assignee."

It may be that one who receives the reissued stock which has been previously surrendered becomes a stockholder, as an original subscriber, but he certainly is not the original subscriber; and the Constitution of Nebraska provides that the original subscribers shall remain individually liable for the unpaid subscriptions until they are paid. It may be that the corporation and the subscriber can, by agreement, release the contract of subscription after it is made; that the corporation can pay back to the subscriber the money he has paid on account of his stock, and surrender to him his notes for any unpaid part of the subscription; and that the subscriber can repay to the corporation the dividends which he has received, and surrender his certificates of stock, so that both parties may be restored to their condition before the subscription was made. Nothing of that nature, however, was done in this case, and it is not important to discuss the effect of such a transaction. The defendants here made no contract of rescission. They

merely sold their stock. The surrender of the certificates, the issue of new certificates to the purchasers, the substitution of the notes of the latter for those of the defendants, evidenced nothing but sales. They are only the usual concomitants of sales of stock in corporations, which, for their own convenience in keeping simple records of the ownership of their stock, are accustomed to require the surrender of the old certificates and the issue of new ones whenever the sales of their stock are called to their attention. The defendants' contracts of subscription were never rescinded. They were the original subscribers to the stock, and the fact that, when they sold it, their certificates were surrendered, new certificates were issued to the purchasers, and the secured notes of the latter for the unpaid part of the subscriptions were substituted for their original notes, does not change their character as original subscribers or relieve them from the modified liability to pay their subscriptions which was sedulously preserved by section 4 of article 11b of the Constitution of Nebraska. State v. German Savings Bank, 50 Neb. 734, 742, 70 N. W. 221.

Some time before July, 1897, the complainant brought a suit in the district court of Pottawattomie county, in the state of Iowa, against these defendants and others, for the same causes of action set forth in the bill in this case, and the defendants interposed the same defenses that they have pleaded here. On July 19, 1897, the district court of that county entered a decree of dismissal of that suit on the ground that the assets of the insurance company had not then been exhausted, and that until they were so exhausted the complainant was not entitled to maintain the action. The complainant appealed from this decree to the Supreme Court of Iowa, and that court affirmed the action of the court below on the ground that a foreign receiver could not maintain the suit in the courts of Iowa. Wyman v. Eaton, 107 Iowa, 214, 220, 77 N. W. 865, 43 L. R. A. 695, 70 Am. St. Rep. 193. Counsel for the defendants insist that this decision of the Supreme Court of Iowa was a conclusive adjudication of the issues in this case. They concede that the decree of the district court, which was subsequently affirmed by the higher court without modification, would not have had this effect if no appeal had been taken from it, because of the familiar rule that the dismissal of an action on the ground that the cause which it presents has not yet accrued is no bar to another action for the same cause after it has matured. But they say that, on an appeal from a decree in a suit in equity, the appellate court tries the case de novo, and enters the proper decree, regardless of the terms of that from which the appeal was taken, and that, from the opinion of the Supreme Court of Iowa in this case, it appears that it determined the issues presented by the pleadings therein upon the merits, and that it affirmed the decree upon the broad ground that there was no equity in the bill. In support of this contention they cite these words from the opinion:

"Dismissing for the moment the effect of an arbitrary legal liability, which must be respected and enforced when known, there is not, in view of the entire record in this case, an equitable consideration favorable to a recovery against these defendants. The present liabilities of the Nebraska corporation cannot truthfully be said to have accrued in consequence of, or with reliance upon,

the former connection of these defendants with the enterprise from which sprang the present company. These facts are important as aiding in the solution of a legal proposition urged by appellees, to the effect that this action cannot be maintained in Iowa, because it is brought by a receiver of a Nebraska corporation to enforce a provision of a law of that state."

But these are the only expressions in the opinion of the Supreme Court of Iowa which even hint at a thought of considering or determining the issues presented by the merits of this controversy, and there is nothing in these expressions which either discusses or decides whether the defense of conditional subscription, of rescission, of limitation, of laches, or of payment, ought or ought not to be sustained. On the other hand, the opinion proceeds to discuss the single question whether or not a foreign receiver could maintain the suit before it in the courts of the state of Iowa, to decide that he could not do so, under the settled law of that state, and to affirm the decree below upon that ground. Wyman v. Eaton, 107 Iowa, 220, 77 N. W. 865, 43 L. R. A. 695, 70 Am. St. Rep. 193. In a suit between the same parties upon the same claim or demand, a prior decision on the merits is conclusive not only of every matter offered, but also of every admissible matter which might have been offered, to sustain or defeat the claim or demand. James v. Germania Iron Co., 107 Fed. 597, 617, 46 C. C. A. 476, 496. But no matter to support or to defeat the claim of the complainant upon its merits was admissible, and no issue concerning any such matter was or could have been lawfully considered or determined by the Supreme Court of Iowa in the case before it, because, by the established rule of that state, the complainant had no legal capacity to present those issues to the courts of Iowa for decision. The issues presented in the case in hand for our determination were not litigable in the Supreme Court of Iowa in the suit of Wyman against Eaton, because the complainant was without legal capacity to present them to the courts of that state for decision. Those courts did not consider or decide them, and neither the decree in the district court, nor the opinion and decision of the Supreme Court, render them res adjudicata between the parties to this suit.

Another defense urged upon our consideration is that this suit is barred by the statute of limitations, and that the complainant has been guilty of such laches that he is entitled to no relief. The defendants took their stock, in the year 1883, and gave their notes for the unpaid part of their subscriptions, payable at such time as the board of directors should prescribe. Actions founded upon written contracts are barred in ten years, and those based upon unwritten contracts and those not otherwise provided for are barred in five years, after the respective causes of action accrue, by section 3447, subds. 6 and 7, of the Code of Civil Practice of the state of Iowa. In Great Western Tel. Co. v. Purdy, 83 Iowa, 420, 50 N. W. 45, the Supreme Court of that state held that an action upon a stockholder's contract to pay a part of the amount of his subscription from time to time as the directors should order was barred after ten years from the date of the contract, because the ordering of the payment, and thus the accrual of the cause of action, depended upon the mere exercise of the will of the obligee named in the contract. It might not be difficult to present persuasive

and cogent reasons why a cause of action based upon such a contract does not and ought not to accrue until the board of directors calls for the payment of the subscription pursuant to the terms of the contract. But it is unnecessary to discuss that question in this case, because, if the decision in Great. Western Tel. Co. v. Purdy were conceded to contain a statement of the true rule, that rule would not defeat this suit. Four years after the defendants gave their notes, and years before any limitation had run against an action upon them, they sold their stock to third parties, and, under section 4, article 11b, of the Constitution of Nebraska, thereby modified their contract into a guaranty to pay the corporate debts of the insurance company, to the amount of their unpaid subscriptions, when those debts should be ascertained, and the corporate property should be exhausted. It is not upon the original notes of these subscribers, but upon this guaranty, that this suit is founded; and, by the very terms of this contract, the defendants were not liable to any suit or action upon it, and no exercise of the will of the corporation or of its receiver could make them so liable until the debts of the corporation were ascertained, and the corporate property was exhausted. The property of the corporation was first exhausted on September 10, 1901, and this suit was commenced on August 7, 1902. The cause of action against the defendants upon their guaranty under the Constitution of Nebraska did not accrue until September 10, 1901, and, as this suit was commenced within one year thereafter, it was not barred by any statute of limitations of the state of Iowa. Van Pelt v. Gardner, 54 Neb. 701, 75 N. W. 874.

Has the complainant been guilty of such laches that he may not invoke the aid of a court of equity? Courts of chancery are not bound by, but in the application of the doctrine of laches they usually act or refuse to act in analogy to, the statute of limitations relating to actions at law of like character. Under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law. But if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it. When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the bill, or by his answer, that extraordinary circumstances exist, which require the application of the doctrine of laches. And when such a suit is brought after the statutory time has elapsed, the burden is on the complainant to show, by suitable averments in his bill, that it would be inequitable to apply it to his case. Kelley v. Boettcher, 85 Fed. 55, 62, 29 C. C. A. 14, 21. This suit was brought within the time fixed by the analogous statute of limitations at law. The burden was therefore upon the defendants to show that, by reason of extraordinary circumstances, this case should be taken out of the general rule, and the doctrine of laches should be applied to it. They have not successfully borne this burden. The corporate assets were exhausted September 10, 1901. This bill was exhibited August 7, 1902. There was no

culpable delay between the accrual of the cause of action and the commencement of the suit. But the defendants insist that the complainant was appointed receiver in June, 1891, and that more than ten years elapsed between his appointment and the sale of the last of the property of the corporation. He was not idle, however, during this period of time. He commenced a suit against these defendants to recover these very subscriptions in 1896. If they were in such haste to pay, the opportunity was offered them more than six years ago. They defeated that suit upon the ground that it was prematurely brought. In view of that fact, there is little force in their suggestion now that this suit is too late.

The complainant is the officer of the courts which have appointed him. He has, during the ten years that have elapsed between his appointment and the complete exhaustion of the corporate assets, acted in collecting and distributing them under the orders of the district court of Douglas county, and the presumption is that neither that court nor its officer has been guilty of undue delay. This record discloses the fact that the complainant has been conducting vexatious, tedious, and fiercely contested lawsuits, which it was necessary for him to conclude in order to exhaust the corporate assets, and to place himself in a position to commence this suit. One of these suits, from which he realized $17,600, was an action against the National Bank of Commerce of Omaha and others to recover $35,000 which the insurance company claimed had been deposited for its benefit. Another was an action against Williams and other stockholders to recover the 50 per cent. of the subscriptions which the receiver claimed had never been paid. That suit was commenced in the year 1892, and it was not concluded until 1897. Wyman v. Williams, 52 Neb. 833, 73 N. W. 285. This was not all the litigation which the complainant was compelled to institute and press to a conclusion in order to exhaust the corporate assets. But when it is coupled with the presumptions in his favor arising from the fact that he commenced this suit far within the time prescribed for the analogous action at law, and that he was the officer of and was acting under a court of general jurisdiction, it is ample to demonstrate the proposition that he was guilty of no such laches in the collection and distribution of the assets of this corporation as will repel him from the precincts of a court of equity. The defense of the laches of the complainant cannot be sustained.

What, then, is the measure of relief to which the complainant is entitled at the hands of a court of equity? He may undoubtedly recover from each defendant an amount equal to 8.375 per cent. of the par value of the stock for which he originally subscribed, because this is the amount of the original subscription, which has never been paid. But the complainant prays for 41.625 per cent. more. He asks this court to avoid the payment made by Williams and his associates, and to compel the defendants to pay again the 41.625 per cent. which the company received from them, and paid to its creditors in 1891. Is he entitled to this relief from a court of chancery? The facts which condition the answer to this question are these: In the years 1890 and 1891 Burns was the secretary, and Williams, Wright,

Johnson, and Burns were four of the six directors, of the corporation, and they owned 609 of the 1,000 shares of the stock.   In the year 1890, and in the early part of 1891, the company was unable, out of its current income, to pay its obligations as they matured; and these directors were honestly endeavoring to maintain its credit, and to keep it in a sound, prosperous, going condition.   They were the heavy stockholders of the company, and were most interested in its success.   They perceived that it would soon be necessary to make an assessment, and to call in a part of the unpaid 50 per cent. of the subscriptions for the stock.   But they deferred action in that direction for a time, and agreed among themselves that they would advance to the company, in prepayment of the assessment soon to be made upon their stock, and in proportion to their ownership of it, the amounts of money requisite to meet the maturing debts of the corporation.   They performed this contract until on April 13, 1891, the company owed them $15,552.61, and interest at 10 per cent. per annum from March 3, 1891, for which they held its promissory notes; and it also owed to Williams $952.34, and to Johnson $250 more.   At that time Burns, the secretary, reported the indebtedness of the company to be $41,703.60, and the board of directors made an assessment of 41.625 per cent. upon its stock for the purpose of paying all the matured obligations of the corporation.   This assessment was sufficient to pay substantially all these debts.   The company was a going concern.   It was constantly receiving its income and conducting its business, and, while it was undoubtedly in reality insolvent, the directors do not seem to have realized this fact.   They had no intention of abandoning its functions or operation, and the evidence convinces that they honestly advanced their money to relieve the corporation from embarrassment, and, as they hoped and believed, to carry it forward to prosperity and success.   The assessment was made, but no stockholder except Williams, Wright, Burns, and Johnson would pay it; and thereupon these four men borrowed from banks on their own credit, and paid to the company in cash, an amount sufficient, together with the amount they had already advanced to the company, to make the entire amount of the assessment, and this money was used by the corporation to pay its debts.   They advanced this money in the proportion of their holdings of the stock, took the notes of the company for their advances, together with assignments of the certificates of the assessment upon the stock of the other stockholders, and agreed with the corporation that when these assessments were paid they should constitute full payment and satisfaction of their notes and interest.   These notes amounted in the aggregate to $41,612, and the assessment upon the stock of the four directors, which amounted to $25,349.13, was paid by them on the day it was made, and was also indorsed and credited upon the notes which they received.   All these transactions were approved by the board of directors.   There was nothing secret or concealed about them.   The assessment, the payment of the assessment upon the stock of Johnson, Wright, Burns, and Williams, the issue of the notes, and of the assignments of the certificates of assessment upon the stock of other holders, were all evidenced by proper resolutions of the board of directors, and were spread upon its records on the day of the transaction.   The insurance company actually received from

these four directors, not because they were anxious to loan money to the corporation to make interest or profit for themselves, but simply because they were stockholders of the corporation and liable to the assessment, more than $41,000 in cash in the years 1890 and 1891, all of which it applied to the payment of its debts, and no part of which has ever been returned to the four directors or to the defendants. The notes which these directors received were never presented as claims against the corporation, and were never intended to evidence such claims, but were issued simply to show the amounts advanced by the directors who held them on account of the assessment which their action imposed upon the stock.

The receiver now asks that this entire transaction be avoided or disregarded, in order that he may compel these defendants to pay again this assessment of 41.625 per cent., while the corporation he represents and its creditors whom this money paid retain the $41,-612 which Williams and his associates delivered to them on account of it; and he asks this because, as he insists, the four directors, as officers of the corporation, were incompetent to contract with themselves as individuals, and because this transaction gave to them, as creditors, a preference over the other creditors of the corporation. But the complainant is appealing to a court of equity for this relief. He is the actor here. Concede for the moment that the directors were not competent to make the contract with themselves, and that they received a preference over the other creditors. Nevertheless their contract and transaction was not void. It was voidable only, and voidable at the option of the creditors or the stockholders of the corporation. Neither the corporation nor its creditors nor its stockholders could take and keep the benefit of the contract and transaction, and repudiate its burdens. The transaction was valid until avoided, not void until confirmed. Gorder v. Plattsmouth Canning Co.; 36 Neb. 548, 556, 54 N. W. 830; Buell v. Buckingham & Co., 16 Iowa, 281, 284, 291, 293, 85 Am. Dec. 516. By this transaction the company and its creditors received on account of the subscriptions to its stock $41,612, which they still retain. A court of equity never grants inequitable relief. The maxim that he who seeks equity must do equity expresses a fundamental principle which conditions all its action. Under this principle, the complainant, the successor and representative of the insurance company and of its creditors, is entitled to no rescission or avoidance of the contract or transaction by which they obtained the $41,612 on account of the assessment upon its stock which it now seeks to enforce again, and to no second payment from the defendants of this portion of their subscriptions until he surrenders and returns either to Williams and his associates, or to the defendants, that portion of the $41,612 which was paid on account of the stock for which the defendants originally subscribed. The return of this amount is a condition precedent to the rescission of this transaction, and to the second enforcement of this assessment. This sum has never been returned, and the bill of the complainant has been searched in vain for any averment of any tender of it, or of any offer to return it. Neither the bill nor the evidence presents a case which entitles the complainant to a rescission or avoidance of the contract or transaction of April, 1891, or to another payment of

the 41.625 per cent. of the subscriptions of the defendants which the company and its creditors realized therefrom. The rule that he who seeks equity must do equity is an insuperable obstacle to the granting by a court of chancery of the relief which the complainant here seeks. Thomas v. Brownsville, etc., R. Co., 109 U. S. 522, 526, 3 Sup. Ct. 315, 27 L. Ed. 1018.

There are other considerations which lead to the same conclusion. In the first place, it is not true, as a general rule, that the directors of a corporation are incompetent to make contracts with themselves as individuals, or that agreements so made may generally be avoided at the suit of creditors or stockholders of the corporation. The only reason why a contract of this character may be set aside in any case is because directors occupy a fiduciary relation to the corporation, and to its creditors and stockholders. This relation is analogous to that of agent to principal, and trustee to cestui que trust, but it is not of so intimate and confidential a character as either of these. Still it is such a relation of trust and confidence that courts scrutinize with jealous care all transactions between directors as officers and as individuals, and require them to be characterized by good faith and the conscientious discharge of official duty. The vice against which they seek to guard them is that the adverse interest of the individuals may overcome the duty of the officials, and induce agreements and transactions detrimental to the corporation, and unduly beneficial to the individuals. Yet in many—probably in most—cases the interest of the directors and officers of the corporation is as great, and it is often greater, in the welfare and success of the company, than in their individual prosperity. In many cases the prosperity of the individuals is conditioned by the success of the corporation they are managing. There is no sound reason why individuals who are directors of a corporation may not come to its assistance in days of financial distress; may not make their contracts to loan money to it; to receive security from it for repayment; to accept payment of obligations to them, to buy property from, or sell property to, it; or to do any other act beneficial to the corporation, or mutually advantageous to both the corporation and the individuals. The question here under consideration has often been discussed and determined by the courts of this country and of England, and, without entering upon an exhaustive review of the opinions, it may be safely said that these principles have become firmly established both by reason and by authority: Contracts and transactions between individuals and corporations of which they are directors or officers, which are fair, which are made in good faith, which do not secure to the individuals any undue or unjust benefit or advantage, and in which the interest of the individuals and the duty of the officials work in unison for the welfare of the corporation, are valid and enforceable both at law and in equity. Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 590, 23 L. Ed. 328; Hotel Co. v. Wade, 97 U. S. 13, 22, 23, 24 L. Ed. 917; Gould v. Railway Co. (C. C.) 52 Fed. 680, 681; Sutton Mfg. Co. v. Hutchinson, 63 Fed. 496, 11 C. C. A. 320; Holt v. Bennett, 146 Mass. 437, 16 N. E. 5; Smith v. Lansing, 22 N. Y. 520, 528; Duncomb v. N. Y., etc., R. Co., 88 N. Y. 1, 6, 9; Buell v. Buckingham & Co., 16 Iowa,

284, 291, 293; Ashurst's Appeal, 60 Pa. 291, 312, 315; Hallam v. Indianola Hotel Co., 56 Iowa, 178, 9 N. W. 111; Combination Trust Co. v. Weed (C. C.) 2 Fed. 24, 25–27; Gorder v. Plattsmouth Canning Co., 36 Neb. 548, 556, 54 N. W. 830. But contracts and transactions between individuals and corporations of which they are directors or officers, which are unfair, in which the individuals have secured an undue or unjust advantage, in which an antagonism between the interest of the individuals and the duty of the officials has resulted in the triumph of the former, are voidable at the option of the corporation, its creditors or stockholders. Bradley v. Farwell, 3 Fed. Cas. 1146, 1151, No. 1,779; Koehler v. Black River Falls Iron Co., 2 Black, 715, 719, 17 L. Ed. 339; Wilbur v. Lynde, 49 Cal. 290, 19 Am. Rep. 645; Davis v. Rock Creek, etc., Co., 55 Cal. 359, 36 Am. Rep. 40; Kankakee Woolen Mill Co. v. Kampe, 38 Mo. App. 229, 234; Union Nat. Bank v. Douglas, Fed. Cas. No. 14,375; Haywood v. Lincoln Lumber Co., 64 Wis. 639, 647, 26 N. W. 184.

In Duncomb v. N. Y., etc., R. Co., 88 N. Y. 1, 3, 10, 11, the executive committee of the board of directors of the railroad company, which consisted of one Rucker, the president, and two others, who were guarantors of the payment of the debt to him, adopted a resolution to pledge the bonds of the company to the amount of $810,000, to secure the payment of a pre-existing debt of the corporation to Rucker of $81,000, and that contract was sustained. In Buell v. Buckingham & Co., 16 Iowa, 284, 290, Buell was one of three directors, all of whom were necessary to constitute a quorum, who sold property of the corporation worth $5,000 or $6,000 to Buell in payment of a debt of $12,000 which the corporation owed him; and the sale was sustained in a luminous opinion by Judge Dillon, in the face of an attack by other creditors of the corporation. In Hotel Co. v. Wade, 97 U. S. 13, 22, 23, 24 L. Ed. 917, the lenders of the money upon bonds secured by a mortgage of the property of the corporation were directors of the company, but the mortgage was sustained and foreclosed. In Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 590, 23 L. Ed. 328, Mr. Justice Miller said:

"While it is true that the defendant, as a director of the corporation, was bound by all those rules of conscientious fairness which courts of equity have imposed as the guides for dealing in such cases, it cannot be maintained that any rule forbids one director among several from loaning money to the corporation when the money is needed, and the transaction is open and otherwise free from blame. No adjudged case has gone so far as this. Such a doctrine, while it would afford little protection to the corporation against actual fraud or oppression, would deprive it of the aid of those most interested in giving aid judiciously, and best qualified to judge of the necessity of that aid, and of the extent to which it may safely be given."

In the light of the principles and authorities to which we have adverted, it is clear that the transaction between the corporation and Williams, Johnson, Wright, and Burns, which the complainant here assails, was not rendered either void or voidable by the mere fact that they were members of the board of directors of the corporation when it was consummated. But counsel for the complainant insists that this transaction was unfair, dishonest, fraudulent, and voidable, because it gave to Williams, Johnson, Wright, and Burns a preference

over the other creditors of the corporation.   The record in this case has been searched in vain for the slightest evidence of any fraud, deceit, dishonesty, or evil intent in or about this entire transaction.   The evidence shows it to have been a reasonable and honest endeavor of the four men most deeply interested in the success of the insurance company to maintain it a going concern, to yield to it needed assistance in a financial crisis, and to place it in a condition in which it might continue its business, at great expense and inconvenience to themselves. If it falls under the ban of the law, it does so on account of the single fact that it gave to Williams and his associates an unlawful preference over the other creditors of the corporation.   It is by no means evident that these men ever received any actual preference over other creditors. The claim of the receiver is that a preference arose in their favor in this way:   The board of directors, as such, never made a contract with Williams, Johnson, Wright, and Burns to the effect that their advances prior to April 13, 1891, should constitute payments in advance upon the assessment made on that day, and when that assessment was made they had taken the notes of the corporation, dated about a month before, for $15,552.61, the amount of money which they had advanced or loaned to the company, and the corporation also owed Williams and Johnson $1,202.34 more; so that there was a pre-existing indebtedness of the corporation to these four men upon that day of $16,754.95. Thereupon they borrowed of banks and paid to the company $24,857.05 in cash, took the promissory notes of the company for $41,612, credited upon them the $25,349.13 assessed upon their stock, and received from the corporation a discharge of their liability for that assessment, and the assignment of the certificates of assessment upon the stock of the other holders.   When we remember that these four men, as directors of this corporation, voluntarily made this assessment upon themselves as individuals, and paid into the treasury of the company more than $24,000 in cash, and yet permitted the corporation to remain indebted to them in the sum of $15,262.87, secured only by the certificates of assessment upon the stock of other holders, which do not appear to have been collectible or of any substantial value, it is difficult to reach the conclusion that they secured any substantial preference here over any other creditors of the corporation.   No other creditor raised and paid to the company 150 per cent. of the amount of his claim against it, and still retained substantially all of his claim unpaid and practically unsecured.   Concede, however, that the assignment of the certificates of assessment as collateral security gave to these four men a nominal preference over some of the other creditors of the company.   Did this preference render this transaction voidable at the suit of those creditors, or at the suit of stockholders of the corporation, under the circumstances of this case?   The ground on which preferences given by corporations are held to be voidable is that when a corporation becomes insolvent, and its officers are, or ought to be, aware that it must soon cease to operate as a going concern, its assets become a trust fund, sacredly pledged, subject only to prior liens, to be equally distributed, first among its creditors, and then among its stockholders. But this trust does not attach until the corporation becomes insolvent. Nay, more, it does not so attach as to avoid preferences given in good

faith until its officers become aware, or by the exercise of reasonable prudence and diligence would have become aware, that the continued operation of the company as a going concern for any considerable length of time is probably impracticable, and that it must soon close its business, cease its active existence, and distribute its property among its creditors. Hollins v. Iron Co., 150 U. S. 371, 382, 14 Sup. Ct. 127, 37 L. Ed. 1113; Sutton Mfg. Co. v. Hutchinson, 63 Fed. 496, 501, 11 C. C. A. 320, 325; Gould v. Railway Co. (C. C.) 52 Fed. 680, 684, 685; Duncomb v. N. Y., etc., R. Co., 88 N. Y. 1, 6, 9; Buell v. Buckingham & Co., 16 Iowa, 284, 291, 293; Hallam v. Indianola Hotel Co., 56 Iowa, 178, 180, 9 N. W. 111; Combination Trust Co. v. Weed (C. C.) 2 Fed. 24, 25–27; Ashurst's Appeal, 60 Pa. 291, 312, 315; Twin Lick Oil Co. v. Marbury, 91 U. S. 581, 590, 591, 23 L. Ed. 328; Hotel Co. v. Wade, 97 U. S. 13, 22, 23, 24 L. Ed. 917. Perhaps there is no clearer statement of the law upon this subject than that contained in the opinion of the Circuit Court of Appeals of the Seventh Circuit, delivered by Mr. Justice Harlan, in Sutton Mfg. Co. v. Hutchinson, 63 Fed. 496, at page 501, 11 C. C. A. 325, in which he said:

"Undoubtedly a solvent corporation, if not forbidden by its charter, may mortgage its property to secure the performance of obligations assumed before or at the time of the execution of the mortgage. So a mortgage executed by a corporation whose debts exceed its assets, to secure a liability incurred by it or on its behalf, will be sustained, if it appears to have been given in good faith to keep the corporation upon its feet, and enable it to continue the prosecution of its business. A corporation is not required by any duty it owes to creditors to suspend operations the moment it becomes financially embarrassed, or because it may be doubtful whether the objects of its creation can be attained by further effort upon its part. It is in the line of right and of duty, when attempting, in good faith, by the exercise of its lawful powers and by the use of all legitimate means, to preserve its active existence, and thereby accomplish the objects for which it was created. In such a crisis in its affairs, and to those ends, it may accept financial assistance from one of its directors, and, by a mortgage upon its property, secure the payment of money then loaned or advanced by him, or in that mode protect him against liability then incurred in its behalf by him. Of course, in cases of that kind, a court of equity will closely scrutinize the transaction, and, in a contest between general creditors and a director or managing officer who takes a mortgage upon its property, will hold the latter to clear proof that the mortgage was executed in good faith, and was not a device to enable him to obtain an advantage for himself over those interested in the distribution of the mortgagor's property. Richardson's Ex'r v. Green, 133 U. S. 30, 43, 10 Sup. Ct. 280 [33 L. Ed. 516]; Oil Co. v. Marbury, 91 U. S. 587, 588 [23 L. Ed. 328]."

Under the established rules of law to which reference has now been made, Williams, Johnson, Wright, and Burns secured no such preference as rendered their transaction with the insurance company voidable. If they secured any preference whatever, it was but a nominal one, evidenced by the assignment of the apparently uncollectible and worthless certificates of assessment as collateral security to their claims. The actual preference they gave to the other creditors of the corporation, to those whose claims were paid by the $24,857.05 which they raised and turned over to the company on April 13, 1891, and to the other creditors of the corporation whose share of its assets was increased by the extinguishment of the claims so paid. None of the moneys which they paid to the company were loaned or advanced to

obtain any advantage for themselves over other creditors or stockholders, from choice, or because they thought they were making a safe or a profitable investment. They voluntarily advanced or paid to this company more than $40,000 to maintain it as a going concern, in the hope, and doubtless in the belief, that in this way they could carry it forward to prosperity and success. They evidently then had no thought that the company would soon be compelled to cease its active existence, or to go into liquidation. While its liabilities doubtless exceeded its assets, they were mostly contingent or unliquidated liabilities. The money which they furnished paid substantially all the matured obligations of the corporation, and put it in a condition which they expected would enable it to successfully continue as a going concern. In other words, their transaction with the company was had before its imminent liquidation was, or would by the exercise of reasonable prudence or diligence have been, known to them. It secured to them no unjust advantage. It was made in good faith. It was of far greater benefit to the corporation than it was to them, and in its conception and consummation the interest of the individuals and their duty as officials worked together in unison for the highest interest of the corporation. Their transaction was not voidable in equity at the suit of the corporation, its creditors, stockholders, or receiver.

This result has not been attained without a careful consideration of the opinion of the Supreme Court of Nebraska in the case of Wyman v. Williams, 52 Neb. 833, 840, 73 N. W. 285, in which that court, reviewing a judgment of the district court of Douglas county in an action between the complainant here and Williams, Johnson, Wright, and Burns, reached the opposite conclusion. But the defendants in this suit were not parties to, and are not bound by, the judgment in that action. This controversy is between citizens of different states, and the duty is imposed upon us by the Constitution and the acts of Congress to form and express an independent judgment upon it. The record in hand does not disclose what the evidence was upon which the decisions in Wyman v. Williams are based. It may have differed from that presented for our consideration, and whatever it may have been the considerations of law and of fact to which we have adverted, force our minds irresistibly to the conclusion that no court of equity ought to avoid or disregard the transaction of April 13, 1891, to enable this complainant to recover from the defendants here a second payment of the assessment made on that day, while those he represents received and continue to retain the benefit of the first.

Finally, counsel for the complainant argue that the defendants are not entitled to the benefit of the transaction between the corporation and Williams, Johnson, Wright, and Burns, because the record does not clearly show that the stock which they held on April 13, 1891, was that for which the defendants originally subscribed, so that it does not appear that the payment of the assessment upon their stock constituted a payment upon the subscriptions of the defendants. It is, however, immaterial whether the stock for which the defendants originally subscribed was owned by Williams, Wright, Johnson, and Burns, or by the other stockholders of the corporation, on that day. If Wright, Williams, Burns, and Johnson held the stock for which the defendants

originally subscribed, that assessment is paid upon it. If other stockholders held it, the right to collect it was assigned by the corporation to Johnson, Wright, Williams, and Burns; and neither the corporation, nor its successor, the receiver, can, as against these defendants, avoid or disregard those assignments, or collect the amount of that assessment of them, without first restoring the consideration for and rescinding the transaction.

The conclusion of the whole matter is that the decree below must be reversed, and the case must be remanded to the Circuit Court, with instructions to enter a decree against each of the defendants Bowman, Rohrer, Shugart, Campbell, Straub, Laub, and Stone for an amount equal in the case of each defendant to 8.375 per cent. of the amount of his original subscription to the stock of the insurance company, with interest thereon from September 10, 1901, and the costs of the suit; to overrule the demurrer of the defendant Kingsnorth; to permit him to answer; and to take further proceedings not inconsistent with the views expressed in this opinion; and it is so ordered